### Palmour & Smith *v.* Johnson.

1. An absolute deed made with intent to delay or defraud creditors, though made also to secure a debt, is void as against creditors if the grantee takes it with notice of the fraudulent intention.
2. Grantor and grantee in the deed both being witnesses, if the former swears he gave notice to the latter, beforehand, of his fraudulent purpose, the latter, by denying in rebuttal other statements in the testimony of the former but not this, virtually admits the fact of notice, there being no explanation of the failure to deny such notice.

December 9, 1889.

| 84 | 91 |
|----|-----|
| 87 | 244 |
| 84 | 91 |
| 100 | 207 |
| 84 | 91 |
| 115 | 388 |

Deeds. Debtor and creditor. Fraud. Notice. Evidence. Admissions. Before Judge Wellborn. Hall superior court. July term, 1889.

On January 7, 1888, the plaintiffs caused an attachment to issue against S. K. Johnson. On the next November 19, they recovered judgment against him, and the execution issuing thereupon was, on the 10th of the following month, levied on land as his property. A claim was interposed by his sister, Mary J. Johnson, on the trial of which the plaintiffs showed a deed, dated August 25, 1887, from G. W. Tanner to S. K. Johnson, conveying the property in question, and introduced a witness who testified that he was occupying a room of the dwelling-house thereon and had possession of the stables; rented it from S. K. Johnson about the first of April, 1889, and had paid the rent to him; the dwelling-house has four other rooms, occupied by claimant and Jake Johnson and their mother, and the one witness rented was previously occupied by S. K. Johnson; there was no one in it when witness went there; did not know how long claimant had been living in the house.

The claimant introduced a deed from S. K. Johnson to herself, dated September 23, 1887, recorded October 13, 1887, conveying the property in question, and expressing a consideration of $575. She then testified, in substance, as follows: I am in possession of the place now (July, 1889). S. K. Johnson was in possession of the storehouse at the time of the levy; was holding possession for me. He went into business in the house, and I never objected to it. The goods therein were first levied on by the constable (referring to the original levy of the attachment, January 7, 1888). S. A. Johnson was in possession at the time of the levy to which this claim was filed; he got possession from S. K. Johnson, who rented it as my agent and my property. S. A. Johnson was my tenant; paid me $4 per month, a part

of it.   I have not been out of possession of the dwelling-
house since January or February, 1888 ; have held pos-
session as my own property, and have given no one
permission to go there.   S. K. Johnson had kept pos-
session of one room.   We had all been living there to-
gether, and after he moved away he left the door locked
and forbade my using that room, which is the one that
Dr. Winn (plaintiff's witness) rented from him and now
has.   S. K. Johnson was in possession of the store-
house at the time of the constable's levy, January 9,
1888.   I was living in the dwelling-house then ; it
was not finished, but no more work except a piazza
·added has been done since.   Remember hearing of the
constable being at the store ; did not see him ; was not
living in the house at that time; was not living there
on January 9, 1888.   The storehouse was then com-
pleted, and S. K. Johnson was running his business
there; but the dwelling was not far enough completed
for any one to live in it at that time.   Do not know
how long he had occupied the store ; he had once rented
it to Spencer for a bar-room.   S. K. Johnson was oc-
cupying it when he made the deed to me.   I agreed for
him to have full possession until he paid me back some
money and relieved the property ; I was to hold it until
he redeemed it.   He turned over the dwelling to me
when I first moved there, but the store has been mine
all the while.   He was to keep possession of it as long
as he wanted to ; he quit after his business was inter-
rupted; never paid me any rent ; it was all brother and
sister, and nothing was said about rent.   I let him have
between six and seven hundred dollars in different pay-
ments before he made me the deed ; finally told him I
could not let him have any more ; he said, "I will pay
you well," and put the property into my hands until he
redeemed it; he delivered me the deed, and I took it to
secure me for that money, and kept it until he borrowed

it to sell the property for me ; he kept the deed afterwards ; he had it recorded. He was not in failing circumstances then, and if he owed money I did not know it. He rented the store as my agent ; he assumed he had that privilege ; I did not appoint him ; know he acted as my agent, because I saw his name to different papers that he signed as such. Last September, I published a notice that he was not and never had been my authorized agent. He never was. He got the workmen for the dwelling, which was erected in December, 1887, and January, 1888. They got some money from me. Some of the money I furnished S. K. Johnson my brothers gave me, some of it was my mother's alimony, and some I worked for. I took no notes ; trusted my brother to keep the business for me. Had been letting him have money for about two years ; cannot tell the exact amount. Paid for some material that went into the store ; signed a mortgage and notes to Clark, Bell & Co. for lumber that went into the dwelling, which was additional to the money to secure which the deed was given. This lumber was purchased by S. K. Johnson by my direction. I also owe S. C. Dinkins sixty odd dollars on account of this property. I had possession of my deed several months ; if it was dated back, I do not know it. Steve Johnson has paid me rent for the store that he rented from S. K. Johnson ; he is not related to me.

S. A. Johnson testified : I rented the storehouse from S. K. Johnson as agent for claimant, in August, 1888, for twelve months. Paid the first quarter to him as agent for her, and he receipted me as her agent ; the balance I paid to her individually ; he gave me notice, after I had paid the first two quarters, not to pay it to her but to him. He has told me many a time, previously to and at the time of the renting, and while he was in possession, that he put the title in her name to keep his

debts off him and until he could get in better condition. We had wanted to buy the property, and he negotiated with us as her agent; when we began to trace the title, he told us he put it in her name to keep off his creditors until he was able to pay them; she said the deed was not made for that purpose, when I went to see her upon seeing her advertisement that he was not her agent. We did not buy but rented instead. Dr. Winn has been in possession for several months. Claimant was living on the balance of the property.

J. M. Bell, of Clark, Bell & Co., testified: S. K. Johnson ordered goods; I shipped a small lot, ten or twelve dollars worth; and he returned and told me the goods were for his sister, and that he would pay for them as soon as he got what he wanted. I posted them on my ledger to him, but on my blotter charged them to him for her. I sent him material used in the building; when he finished buying he did not pay, but said he would do so or make me safe. I told him I would file a lien, and he said he would have his sister make me a mortgage to secure me, and in a short time came up with her and did so. She signed a note, and I had it recorded. I accepted the mortgage in place of filing a lien. This was about the middle of February, 1888, after the stock of goods had been attached, which fact I knew. I did not know anything about the ownership of the property. He had the deeds in his possession; said he brought them for me to look at, and that I could keep them until I got my money. I was not going to send any more goods. Had sold a few, and he paid for them; and when he came for the material to go into the house, I knew it was safe as I could file a lien. Then he said it was for his sister and she would make me the mortgage.

For the plaintiffs, S. K. Johnson testified: I was doing business in 1887. We had bad crops, and I was

making bad collections, and I told my brother, A. B. Johnson, I would make over my property to him and to make me secure in a home for my mother and sister. He said, "You are living with them, and I expect to move to Texas, and would rather you would not make it to me; make it to her, and she will treat you right." She agreed, and I then made it over to her to make my creditors hold oft. I told Miss Mary that the crops were bad and that I expected I would get into a little trouble and I [would] have to make a deed to her to secure a home for her and our mother and make my creditors hold off and give me a showing to pay my debts; and she agreed that I make it in her name for a certain length of time. She said it would only be for a very short time, "may be until I marry, and then you will have to take the deeds back in your name"; and I said, "Whenever I make this deed, I will have two written at the same time." I did so. They were written at the same time and by the same man. She was to make one back to me to make me whole; the reason that was never done was on account of a little fuss between us. I never delivered the deed to her; thought it was unnecessary to take one back from her. The deed in evidence came from my pocket; I have had possession of it all the time, except a few months when I had it in my brother's trunk. It was dated back for the purpose of securing the property and mortgages that I had made on purchases; it ought to be dated in October instead of September. Plaintiffs were creditors of mine, and I was greatly indebted to others (naming several). I dated the deed back to get ahead of some bills pressing me. I was in possession of the property on January 9, 1888; had possession of the deed; it had never been delivered to claimant. I had, with goods and all, about fourteen or fifteen hundred dollars; had more property than I owed. Was a

single man then.  About thirty dollars is all I have got from claimant.  Signed that deed for $500, but that was done to make my creditors hold off.  Yes, it was fixed up as a fraud—to make my creditors hold up and give me a chance to pay my debts.  Told Bell this after I bought the goods; bought them before I got into trouble; commenced in August, 1887.  The goods bought of his firm for the dwelling were not paid for, except $30 or $35; the remainder is what my sister gave the mortgage for.  At the time I made this deed I had a wife.  Owed Clark $600 besides what I mentioned above.  Paid about $950 to build the store and dwelling; the latter has cost me $600 besides the debt to Bell assumed by claimant; I paid this in goods and money from my store for lumber and carpenters. · The store was built after the deed to claimant was made. I was worth $1,400 both before and after I made the conveyance.  The property was worth $1,400.  My sister had no money that I knew of; she was the head of the family; I boarded with her.  Know of no means of support except an income of about $8 per month, which was my mother's.  My sister owes me a balance of $207.37 on a book account for provisions honestly used in the family, after crediting her with $10 per month which I was to pay.  I owe her nothing.  She owes me house-rent for a year before she moved into my house, and the rent of the property since January, 1888. I have never delivered possession to her.  My mother is helpless, and stays with her.  I have given her credit on account of house-rent for the $30 she let me have. The goods I bought at Bell's and Dinkins' went into the improvement.  She assumed the debt because the deed was in her name; I had the debt charged up to myself.

One of the plaintiffs testified that the debt on which the execution is founded was contracted from May to

December, 1887; that S. K. Johnson told him he owned the property and was in possession of it; and that it was on the strength of that property that credit was given him, but witness did not go down there.

For the claimant, J. K. Johnson testified: I am brother of defendant and of claimant. About the time they started the storehouse, she had been letting him have money, and promised to do it. When he came for it, she said, "Sam., I can't let you have any more; I have to keep what I have on account of sickness and death." He said, "I will make you safe," and brought her a deed. After that, she let him have money, ten, twenty, thirty and forty dollars at a time, nearly as often as he went to Gainesville or Atlanta. I stay in the house with them. She tried to control it; she could when there was not too much whiskey there. I know nothing about the contract for Sam. to pay $10 per month board; he put it at $8, and sometimes the store account would go two dollars or so over, and he said let it go. His book will tell if he has not torn out the leaves. I know nothing about the account against my sister; don't think he does either; he did not claim it when he left there. I was not present when he gave her the deed. When he started to Mr. Roberts' to get some money, he asked her for it. She worked for her money, sewed, and got some from her father; don't know how much. She did the house work, made her own clothes and a heap of clothes for those who wanted them; she worked all the time. I have lived with her all my life; advised her not to let Sam. have money, for he was drinking whiskey. He had a judgment against him in Athens, and had to homestead to keep out of that. My sister knew this.

The claimant testified: Sam. first proposed to pay me $10 per month. Then he found that the family did not consume more than $6 to $8 per month, and after a

while concluded that there was no use in saying any-
thing about board. If I owe him a cent in the world,
I do not know it. He got more than $30 from me.
The $30 he spoke of was sent by Jim Wofford to buy
sash and blinds; he has never paid me back. . He got
such amounts as twenty, twenty-five and thirty dollars,
and sometimes as high as forty dollars, from me. The
contract between us was, that he was to redeem the
property, and then I was to make him a deed back.
He owed me as much as $500 when I took the deed. I
have not paid anything since, but have assumed these
notes.

The jury found the property not subject. The plain-
tiffs moved for a new trial on the grounds that the ver-
dict was contrary to law and evidence, and because of
newly discovered testimony (met by claimant's affidavit,
denying its truth) showing that the deed to her was
made for the purpose of defrauding creditors and that
she knew this. The motion was overruled, and the
plaintiffs excepted.

PERRY & DEAN, for plaintiffs.

W. I. PIKE, G. H. PRIOR and W. F. FINDLEY, for
claimant.

BLECKLEY, Chief Justice.

1. By the code, §1952, every conveyance of real or
personal estate, made with intention to delay, or defraud
creditors, if such intention be known to the party tak-
ing it, is void as against such creditors; and either notice,
or grounds for reasonable suspicion, will be treated as
equivalent to knowledge. An absolute deed made as a
security for a debt is within this rule. "A fraudulent
conveyance cannot stand against creditors, whether
made to secure a debt or not. The conveyance must
be pure—it must be made *bona fide*, and with no purpose
known to or suspected by the creditor to hamper and

entangle the property as against other creditors for the sake of hindering or delaying them.  If made partly to secure a debt, and partly to hinder, delay or in any way defraud other creditors, and the creditor taking the deed has knowledge of this latter intention, or grounds for reasonable suspicion, no title will pass as against the other creditors. The morality of this species of conveyance must be as high as that of any other, but need not be higher.  A conveyance to secure must be in all respects as clean and clear as a conveyance for permanent ownership." *Phinizy* v. *Clark,* 62 *Ga.* 626, 627.

2. In the present case, the claimant was a witness in her own behalf.  She was present at the trial and examined twice, once before her brother, the defendant in *fi. fa.* and maker of the conveyance to her, was examined, and once afterwards.  She stated in her first examination that he was not in failing circumstances when the deed was made, and if he owed money, she did not know it.  He testified that he told her the crops were bad and that he expected to get into a little trouble, and that he would have to make a deed to her to secure a home for her and their mother, and make his creditors hold off and give him a showing to pay his debts, and that she agreed for him to make it in her name, etc. When she came to rebut his evidence in her second examination, she did not deny that he made this statement to her, although she contradicted him on other parts of his testimony in several particulars.  The fair implication is that she failed to deny this part of his statement only because she could not deny it truthfully. It certainly called for contradiction if it was not true, and if true, it put her upon notice of his intention in making the deed.  Though she may not have known that he owed any debts, she ought to have known it, or strongly suspected, if he told her that he expected to get into trouble and wished to make a deed to hold off

his creditors and to secure her and their mother a home. Upon another trial, this element of the case, as well as the others, ought to be reconsidered and thoroughly investigated. We think a new trial should be had, and that the court erred in not granting it.

*Judgment reversed.*