FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff,

v.

The UNITED STATES of America, Internal Revenue Service, Global Industries, Inc., NCR Corporation, Joan Coffman, Georgia Ann Harmon, Trustee, Fidelity Equipment Leasing Corp., Urban Industries, Inc. of Kentucky, Weslo, Inc., Merchants and Businessmens Mutual Insurance Co., Bituminous Casualty Co., Firemen's Fund Insurance Co., Newark Insurance Co., Defendants.

Civ. A. No. C80–278A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 24, 1986.

J.D. Roy Atchison, U.S. Atty., Richard F. Mitchell, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., A.M. Wilkinson, Jr., John G. McCullough, Wilkinson & McCullough, Atlanta, Ga., for NCR Corp.

Robert M. Travis, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Urban Indus., Weslo, Fireman's Fund, Newark Ins., Merchant & Business Mens Mut. and Bituminous Cas.

Martin J. Blank and Paul Hawkins, Freeman & Hawkins, Atlanta, Ga., for Joan Thevis.

Burgess W. Stone, Levine & D'Alessio, Atlanta, Ga., for Velda Joan Thevis.

John F. Murray, Acting Asst. Atty. Gen., and Steven Shapiro, Chief, Civil Trial Section, Southern Region, Dept. of Justice, Tax Div., Washington, D.C., for U.S.

Dist. Counsel, I.R.S., Atlanta, Ga.

Wesley P. Adams, Ogden, Robertson & Marshall, Lousiville, Ky., for Urban Industries, Inc. of Kentucky.

Edward E. Strain, III, Cathy & Strain, Cornelia, Ga., for Global Industries, Inc.

Garland, Nuckolls & Catts, Atlanta, Ga., for Fidelity Equipment Leasing Corp.

## ORDER

HAROLD L. MURPHY, District Judge.

### BACKGROUND OF THE CASE

In 1974 Michael G. Thevis, convicted of certain federal crimes, entered federal prison, and undertook to sell Global Industries, Inc. to his associate, Laverne Bowden. This sale transaction was re-negotiated or modified in 1975, 1977 and 1978. Ms. Bowden used the entity "Fidelity Equipment Leasing Corp.," as the vehicle for the acquisitions, which became the parent of

Global Industries, Inc. and Global's own numerous subsidiaries.

In 1978, as part of the last re-negotiation, Fidelity Equipment Leasing Corp. caused Global Industries, Inc. to issue a (second) deed to secure debt on Global's property at 267 Marietta Street in Atlanta, Georgia to Mr. Thevis, who simultaneously assigned it to an inter vivos trust also established at that time. The trust and its assets were assigned to secure Mr. Thevis' obligation to pay alimony to Joan Thevis, now Coffman, then his wife, whom he was divorcing. On April 28, 1978 and subsequent to (1) the divorce settlement, (2) the creation of the trust, (3) the last re-negotiation of the Global sale and the granting of the deed to secure debt, and (4) the assignment thereof to the trust, Mr. Thevis escaped prison.

During 1978, through the summer of 1979, Ms. Bowden remained at Fidelity Equipment Leasing Corp., apparently in charge, until she was allegedly terminated at the direction of Mr. Thevis. From that time until March of 1981, Fidelity Equipment Leasing Corp. was under the alleged supervision of Georgia Ann Harmon, trustee of the alimony trust, although day-to-day operation was in the hands of Lynda Ivy. In March of 1981, the Internal Revenue Service seized all of the known assets of the business, and it has not operated since that time.

The property at 267 Marietta was foreclosed upon by the Federal Deposit Insurance Corporation, and at issue herein is whether the second deed to secure debt thereon is enforceable.

The United States contends that the sale of Global Industries, Inc. to Laverne Bowden was a sham, a transaction without substance, undertaken to permit Mr. Thevis to remain in control of Global Industries, Inc. during his imprisonment, that he in fact remained in control, and that the transactions leading up to the granting and assignment of the deed of trust were for his benefit. The United States further contends Fidelity Equipment Leasing Corp. was the agent or alter ego or nominee of Mr. Thevis, its purported ownership by Ms. Bowden was a sham, and the Fidelity-Thevis transactions must be disregarded and set aside by this court.

The United States claims the proceeds of the foreclosure sale of 267 Marietta pursuant to two separate encumbrances, a federal tax lien duly filed on August 10, 1978, and a decree of forfeiture entered by this Court on December 11, 1979 under 18 U.S.C. § 1963 (the RICO Statute). In the consolidated pre-trial order, Joan Coffman objected to the "dual capacities" in which the United States appeared herein, claiming that the "positions are contradictory." The United States, in order to both preserve its lien and to enforce the forfeiture, claims the alimony trust's mortgage is void and unenforceable.

When this case was instituted in 1980, both the trustee, Georgia Ann Harmon, and the beneficiary, Joan Thevis (now Coffman), were named as defendants and appeared, to claim under the alimony trust. Pursuant to this Court's order of August 3, 1982, however, Harmon's attorney withdrew, and has not been replaced, and the trustee has not otherwise appeared. The Trustee is in default of the pre-trial requirements.

Although the trustee is in default, the United States acknowledges that the rights and interests of the trust may be protected and litigated by a beneficiary, such as Ms. Coffman. The trustee is a necessary party to the action, and she is joined, albeit she is in default.

## STATEMENT OF THE CASE

This is an interpleader action brought by the Federal Deposit Insurance Corporation ("FDIC") as successor to the Hamilton Bank and Trust Company pursuant to 28 U.S.C. § 1335. The FDIC, as holder of the first mortgage on 267 Marietta Street, Atlanta, Georgia, foreclosed its lien on Global Industries, Inc., and after satisfying the outstanding amount of the mortgage, paid surplus cash proceeds from the foreclosure sale into the registry of this Court. (Those proceeds were in the amount of $360,-788.83, and at this time have increased to

over $650,000.00). Thereafter, this action was filed by the FDIC, naming as defendants the potential claimants to these funds.

When this action was originally commenced, there were a number of parties participating and asserting claims to the funds in the registry of the Court. As the litigation has progressed, there have emerged two principal parties to this litigation, Joan Coffman and the United States of America. Additionally, judgment creditors NCR Corporation and Urban Industries and its insurers lay claim to the funds involved in this litigation, but took no active role in the trial of this case.

It is undisputed that the rights to be established in this case depend on the determination of the issues between Joan Coffman and the United States of America. If Joan Coffman prevails, then the other parties, including the United States, will be cut off. If the United States prevails, then the right to the funds in the registry of the Court will be a matter of lien priority to be determined by the Court at a later hearing.

Joan Coffman claims in this action pursuant to a divorce Settlement Agreement with Michael G. Thevis and a resulting Alimony Trust of which she is beneficiary. The Alimony Trust was funded with a $2,000,000.00 promissory note in favor of Michael G. Thevis which was secured by a Deed to Secure Debt (second mortgage) on 267 Marietta Street, which note and second mortgage had been assigned to the trustee of the Alimony Trust. Upon default in the payment to the holder of the first mortgage, it (the FDIC) foreclosed upon the property at 267 Marietta Street, Atlanta, Fulton County, Georgia, and upon its public sale utilized the cash received to extinguish the indebtedness due the first mortgage and interpled the remaining proceeds of the sale into this Court. Ms. Coffman claims her lien was established on April 28, 1978 and is first in priority among all the claimants.

The United States of America claims in this action in two capacities. The United States claims these proceeds by virtue of a prior decree of forfeiture entered by this Court on December 11, 1979 under the Federal RICO statute. Additionally, the United States claims under a federal tax lien which was filed on August 19, 1978, which arose from Jeopardy Assessments made against Michael G. Thevis, Joan Thevis (Coffman), and Global Industries, Inc. These assessments were for the tax years 1972, 1973, 1974 and 1975.

Urban Industries and its insurers claim by virtue of a judgment against Michael G. Thevis entered on May 1, 1978, in Louisville, Kentucky, domesticated in the State of Georgia, and recorded on June 22, 1978, in the Superior Court of Fulton County.

NCR Corporation claims by virtue of a judgment against Global Industries, Inc. which was recorded on the General Execution Docket in Fulton County Superior Court on May 25, 1979.

The United States contends that in a series of transactions between 1974 and 1978, Michael G. Thevis purported to sell his business, Global Industries, Inc., to Fidelity Equipment Leasing Corp., which was allegedly owned by Laverne Bowden. The United States contends that this transaction, or series of transactions, is a sham, contrived by Thevis and Bowden to hide the former's continued control and ownership of Global Industries, Inc., that in fact Thevis continued to own and control Global Industries, Inc., and these transactions should be set aside, and held void by this Court.

During the course of the final restructuring of the sale in 1978, Fidelity Equipment Leasing Corp. caused Global Industries, Inc. to deliver a mortgage on Global property to Mr. Thevis, which Mr. Thevis simultaneously assigned over to an alimony trust, which trust Michael Thevis had simultaneously created. The United States contends that this mortgage is a component part of the sham sale transaction, was issued without consideration, at the direction of Michael Thevis, and must be held void and of no effect by this Court.

Joan Thevis Coffman contends that the transactions were no sham, and may not be

set aside by this Court. Alternatively, Ms. Coffman contends that, even if the sale to Fidelity is found by the Court to be a sham and unenforceable, nonetheless her interest in the subject monies must be protected, for the reason that she is an innocent purchaser for value with respect to the Global mortgage, that she has enforceable third-party rights in the note and mortgage free and clear of any taint of the sham transaction.

The United States disputes the contentions of Ms. Coffman. It contends she cannot for her own account assert such third-party standing and that the transferee of the mortgage was the alimony trust, not Ms. Coffman personally. The claim of "innocent party" must inure to the trustee, or to the settler, or to the primary beneficiary—not to Joan Coffman, who was only a contingent beneficiary. Even if she had standing to make the claim, Joan Coffman is not entitled to the rights of an "innocent party," because she was on full notice as to intentions and motives of Michael Thevis, and had grounds to suspect that the sale was sham and the mortgage void.

The United States contends that Fidelity Equipment Leasing Corp. and Laverne Bowden served as the alter ego or nominee of Michael Thevis, so that the transactions among them are of no force and effect.

This case was inactive for sometime pending litigation in the Tax Court which the parties thought might lead to a disposition of this case. Those proceedings, now terminated, do not impact on the issues before the Court in this litigation.

This cause came on for trial before the Court without the intervention of a jury. After considering the evidence, the argument of counsel and the submissions of the parties, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Michael G. Thevis of Atlanta, Georgia, founded and owned completely a firm by the name of Global Industries, Inc. Global itself owned a large number of subsidiary corporations, many of which were involved with the wholesale or retail distribution of adult books, magazines and films, usually referred to as pornography. Other Global subsidiaries were engaged in music production, real estate, or other "non-adult" enterprises.

2. Michael G. Thevis and Joan Coffman were married, on September 26, 1951. During the marriage of almost twenty-seven years, they had five children. During the last years of their marriage, they lived in a large home on Powers Ferry Road in Atlanta. The home was titled in Mr. Thevis' name alone and was unencumbered. In late April 1978, Ms. Thevis obtained a divorce in the Superior Court of Fulton County, Georgia.

3. In December 1974, Thevis entered federal prison, and remained in custody until 1978, pursuant to a series of federal criminal convictions related to obscenity, arson and extortion.

4. In November 1974, Michael G. Thevis, sole owner of Global Industries, Inc. agreed to sell certain assets of Global Industries, Inc. consisting of certain of the subsidiaries of Global which made up the "adult" portion of its business to Fidelity Equipment Leasing Corp. and its sole shareholder, Laverne Bowden, a trusted friend and long term employee of Mr. Thevis, for a purchase price of $5,200,000.00. The purchase price was represented by a small cash down payment and a note for the balance. As security for the payment of the note, Ms. Bowden executed a personal guaranty, pledged her shares of stock in a company owned by her known as Omega Sales, and pledged the stock of the companies purchased, all of which security was delivered to an escrow agent.

The terms of this agreement are set forth in the following exhibits which are before the Court: Memorandum of Agreement for the Sale of Stock by Global Industries, Inc., dated July 29, 1974; Certificate of Corporate Secretary of Global Industries, Inc.; [Sale] Agreement of November 30, 1974; Promissory Note from Fidelity to

Global in the amount of $5,190,000.00 dated November 30, 1974; and Guaranty Agreement of the same date.

This transaction is referred to by the parties as the "first transaction."

5. In November 1975, the "first transaction" was rescinded, renegotiated, and restructured as of the date of the original sale. Under this restructuring agreement Fidelity purchased one hundred percent of the stock of Global from Mr. Thevis for a purchase price of $16,240,000.00. As security for the payment of the note pursuant to this restructuring, Ms. Bowden executed a personal guaranty agreement, pledged her shares of stock in Omega Sales, and pledged the stock of Global, all of which security was delivered to an escrow agent.

This transaction is evidenced by the following documents: Action Taken by the Board of Directors of Fidelity Equipment Leasing Corporation; Rescission Agreement; Sale Agreement; Escrow Agreement; Collateral Promissory Note in the amount of $16,240,000.00; and Guaranty Agreement.

This restructuring is referred to by the parties as the "second transaction."

6. In March 1977, the "second transaction" was renegotiated and restructured wherein the purchase price, its payment terms, and security agreement for the sale were modified. The principal balance of the debt was reduced to $11,200,000.00. Additional security in the form of a second deed to secure debt on real property owned by Global, known as 267 Marietta Street, Atlanta, Georgia, was allegedly taken. No second mortgage executed at this time is of record in the case.

This transaction is evidenced by the following documents: Modification and Security Agreement; and Allonge to the promissory note in the renegotiated amount of $11,200,000.00.

These facts are referred to by the parties as the "third transaction."

7. On March 1, 1978, the single promissory note of March 1, 1977 in the amount of $11,200,000.00 was recast into two promissory notes.

The documents reflecting this transaction are: Amendment to Modification and Security Agreement; Collateral Promissory Note in the amount of $8,729,341.00; and Collateral Promissory Note in the amount of $2,000,000.00.

8. Shortly after completion of the "first transaction" Michael G. Thevis entered federal prison.

9. After the "first transaction" Michael Thevis and Joan Thevis remained officers and directors of Global Industries, Inc. and its remaining subsidiaries.

10. In the 1975 transaction ("the second transaction") which rescinded the 1974 transaction and resulted in a new agreement, retroactive to 1974, Michael Thevis purported to sell all of Global Industries and its subsidiaries, both "adult" and "non-adult" to Fidelity Equipment Leasing Corp. The contract documents provided, however, that while the purchase price was unpaid Michael Thevis retained broad powers to appoint officers and select directors for the "non-adult" portion of the Global group, which included Global and its real estate.

11. Michael Thevis even though and while in prison exercised his powers to choose Global officers, and installed trusted associates Leon Walters and Patricia McLean as officials of Global to protect his interests.

12. In 1975 sale ("the second transaction") required that Fidelity make periodic payments to Thevis, but Fidelity was unable to make the required payments. Thus, in 1977 the sale was again modified, the sale price was reduced to $11,200,-000.00, and the payment schedules were adjusted. This 1977 modification ("the third transaction") required that Fidelity deliver to Mr. Thevis, as additional security, deeds to secure debt on the real property owned by Global, including the real property bringing the monies which are made the subject of this suit at 267 Marietta Street. These deeds to secure debt were not recorded during 1977, if ever executed.

13. In 1978, contemporaneously with the divorce action, Mr. Thevis' sale of Global to Ms. Bowden was cast a fourth and final time, and at this time Global did execute and deliver a deed to secure debt on 267 Marietta Street, for the benefit of Michael Thevis. It was recorded in the Fulton County deed records on May 8, 1978.

14. Handling these 1975, 1977 and 1978 transactions on behalf of Bowden and Thevis were Atlanta attorneys Gilbert Deitch and Warren Shulman.

15. Although Ms. Bowden warranted that she was the sole shareholder in Fidelity, no stock was ever issued to her, and an unexecuted Certificate No. 1, made out to Ms. Bowden was discovered in the Fidelity stock book long after her departure from the scene.

16. Global carried a large receivable due from Mr. Thevis at the time of the purported sale thereof to Fidelity, which receivable was not then retired. Even after the sale, Fidelity accountants continued to charge corporate expenditures to that receivable account, *i.e.,* classify corporate expenses as additional loans to Thevis.

17. While in prison, Michael Thevis remained in frequent communication with the business by telephone, and in 1976 Fidelity funds were used to make a surreptitious payment to a prison chaplain, to preserve those telephone privileges.

18. In 1975 Thevis stated to Roger Underhill that the sale of Global to Ms. Bowden was a "front that the Government couldn't crack."

19. In 1976 Thevis stated to Leon Walters that the sale to Bowden was a sham.

20. In late 1977, Joan Thevis commenced a divorce proceeding against Thevis. At that time she owned virtually no assets in her own name. She sought a property settlement from Thevis, and made a demand for a two million dollar lump sum settlement.

21. Joan Thevis was represented in the divorce proceedings by attorney Morton Levine, who filed a timely *lis pendens* notice on the Thevis' residence, warning all persons that the title to that property was in litigation.

22. In 1978, Michael G. Thevis and Velda Joan Thevis and their respective attorneys, Warren Shulman and Morton Levine, finalized the terms of the Thevis' divorce after months of negotiations between the parties and their attorneys. That agreement is embodied in the Settlement Agreement entered into by Michael G. Thevis and Velda Joan Thevis, now Coffman, which settled all issues between the parties insofar as their marital rights and obligations were concerned. Among other things, Michael Thevis agreed: to convey to Joan Thevis the family residence; provide her with lifetime alimony; transfer to her several automobiles, life insurance policies, and shares of stock; provide a trust for the five Thevis children; and convey real property to Joan Thevis in Florida, Bartow County, Georgia and Clayton County, Georgia.

23. Negotiations between counsel for the parties culminated in the Settlement Agreement which was prepared in its executed form by Joan Thevis' attorney, Morton Levine, and delivered by Levine to Michael G. Thevis' attorney, Warren Shulman. Warren Shulman presented the agreement to his client in Indiana on either April 25 or 26, 1978 at which time the same was executed by Michael G. Thevis as were certain other documents called for in the agreement. All the papers were returned to Joan Thevis' attorney for her execution which was accomplished on April 28, 1978 in Atlanta, Georgia.

24. Pursuant to the Settlement Agreement in the divorce action, the following documents were executed: Alimony Trust Agreement; Irrevocable Living (Children's) Trust; Deed to Secure Debt and Security Agreement on 267 Marietta Street; Assignment of $2,000,000.00 Note and Deed to Secure Debt; Assignment of $8,000,000.00 Promissory Note; Assignment of Stock; and Assignment of Life Insurance. Michael Thevis conveyed to Joan Thevis by warranty deed, the family residence and the properties in Bartow and Clayton Coun-

ty, Georgia. Certain of the settlement documents were executed by Georgia Ann Harmon acting as provided for by a Power of Attorney from Michael G. Thevis dated April 26, 1978.

25. On April 28, 1978, Michael Thevis and Joan Thevis were granted a divorce upon Ms. Thevis' petition in the Superior Court of Fulton County, Georgia.

26. Michael Thevis escaped from prison on the night of April 28, 1978.

27. At the time of the commencement of the divorce action, Michael Thevis and his wife Joan Thevis, were the subject of an ongoing income tax examination by the Internal Revenue Service. Their representative in the examination was Atlanta accountant T.D. James, now deceased. Joan Thevis had executed various Treasury documents concerning the examination, including extensions of the statute of limitations and the appointment of T.D. James, as her representative, she had provided financial records to the IRS and was aware of the examinations.

28. During the first four months of 1978, besides being a federal prisoner, Michael Thevis was (a) the target of an on-going federal grand jury inquiry in the Northern District of Georgia, (b) the defendant in a civil arson case in Louisville, Kentucky, that came to trial in April, 1978, and (c) the defendant in State criminal charges filed by the State of Florida. All of these pending matters were commented on regularly by the Atlanta news media.

29. In negotiations with Michael Thevis, Joan Thevis and her counsel were assisted at all times, and without compensation, by accountant T.D. James, who also served as an accountant for Fidelity, and who had particular knowledge and information concerning the assets and affairs of both Michael Thevis and Fidelity. T.D. James provided information to Ms. Thevis' counsel to assist her counsel in framing the demands made on Michael Thevis. At this time Fidelity and Global were under an income tax examination, with revenue agents present regularly at Fidelity offices, and such examination was known to T.D. James.

30. The negotiations for the property settlement in the divorce action culminated in a series of legal instruments executed by Michael Thevis, Joan Thevis and others during the period of April 26–28, 1978. At that time, Michael Thevis was being held in the Floyd County Jail, at New Albany, Indiana, where he was assisting in the defense of a civil action against him in Louisville. A jury verdict against him of some $670,000.00 had been returned in that court several days earlier, and which was reported in the Atlanta newspaper.

31. At the time of the execution of these instruments, Michael Thevis anticipated that a large civil tax case might be filed against him, he was concerned over the adverse outcome of the Louisville civil suit, and he was concerned over government efforts, through the criminal investigation, to tie up his assets.

32. In the settlement negotiations, Michael Thevis acceded to the demands of his wife, and transferred to her or to trusts in which she or the children were beneficiaries, virtually all of the real property, stocks and life insurance, that he owned, together with the Fidelity notes to him for the purchase of Global Industries, Inc. Also he agreed to pay Joan Thevis alimony of $12,000 per month, so long as she lived.

33. As part of this marital settlement, the payment schedule between Fidelity and Thevis was renegotiated. The previous note obligation of which some $10.7 million remained unpaid was broken into Note A for $2,000,000.00 and Note B for $8,729,-341.00. The deeds to secure debt, which in 1977 were supposed to secure the entire obligation, were changed to secure only Note A—which is the note upon which the claimant, Joan Thevis, now Coffman, comes before this Court.

34. Pursuant to the provisions of the settlement agreement, two inter vivos trusts were created by Michael Thevis. His cousin, Georgia Ann Harmon was appointed trustee of each, and given a general power of attorney by Thevis. A trust for the benefit of the Thevis children was

created, and Note B was assigned to it. An "alimony trust" was created, and the $2 million note, Note A, secured by several deeds to secure debt, was assigned to it. Pursuant to its terms, and the related terms of the settlement, Michael Thevis or his estate was to pay Joan Thevis $12,000 per month alimony so long as she lived, irrespective of remarriage. The monthly payments on Note A were to be passed on by the trustee to Michael Thevis, unless Joan Thevis certified to the trustee that he had defaulted upon his alimony obligation, at which point the trustee was to pay Joan $12,000 per month, out of income if available, or out of corpus, until or unless the default was cured. At Joan Thevis' death, the alimony trust would terminate, and its assets revert to Michael Thevis or to his estate.

35. At the time of the execution of these instruments, including the delivery, assignment and recordation of the deeds to secure debt on the property of Global, Michael Thevis was indebted to the United States for unpaid income taxes for prior years in the amount of more than 2.5 million dollars. Global Industries, Inc., similarly was indebted to the United States for unpaid income taxes for prior years in the amount of more than ten million dollars.

36. The power of attorney from Michael G. Thevis to Georgia Ann Harmon was recorded on May 8, 1978, Deed Book 6951, Page 171, Fulton County Records.

37. The Deed to Secure Debt and Security Agreement from Global Industries, Inc. to Michael G. Thevis was recorded on May 8, 1978, Deed Book 6951, Page 178, Fulton County Records.

38. The Assignment by Michael G. Thevis to Georgia Ann Harmon was recorded on May 8, 1978, Deed Book 6951, Page 204, Fulton County Records.

39. Prior to the divorce, on March 30, 1978, and again on April 11, 1978, the IRS requested that Michael G. Thevis and Joan Thevis execute Consent Forms 872 so as to extend the statute of limitations for the IRS for assessing additional tax, and for further review of prior returns by the taxpayers. This consent was given by the taxpayers prior to the granting of the divorce.

40. On or about August 10, 1978, a Jeopardy Assessment pursuant to Internal Revenue Code Section 6861 was made by the Internal Revenue Service against Michael G. Thevis, Joan Thevis and Global Industries, Inc. This Jeopardy Assessment was made by the IRS without any prior notice to the taxpayers.

41. The original Jeopardy Assessments against Michael and Joan Thevis were reduced by agreement of the parties in United States Tax Court and were satisfied in full.

42. The United States claim for forfeitures under RICO, Affidavit of Notice, was recorded on June 21, 1978, Deed Book 6986, Page 290 and 292, Fulton County Records.

43. The United States tax lien claim, Affidavit of Notice, against Global Industries, Inc. was recorded on August 10, 1978, Deed Book 7026, Page 367 and against Michael G. Thevis and Joan C. Thevis on August 10, 1978, Deed Book 7026, Page 368, Fulton County Records.

44. The Urban Industries claim, Affidavit of Notice, was recorded on June 22, 1978, Deed Book 6986, Page 452, Fulton County Records from a judgment of May 1, 1978, *Urban Industries, Inc. of Kentucky, et al, v. Thevis* (Civil Action No. C75–0432 L(A), W.D.Ky.).

45. The NCR Corporation claim of judgment against Global Industries, Inc. was recorded on the General Execution Docket of Fulton Superior Court on May 25, 1979, Deed Book 653, Page 468, Fulton County Records.

46. Joan Thevis Coffman's claim for alimony pursuant to her divorce decree from Michael G. Thevis is currently in arrears (without any interest being applied) in an amount in excess of the corpus interpled into this Court in this proceeding, including interest on this corpus which was generated by investment under prior Order of this Court.

47. On Friday night, April 28, 1978, Thevis escaped from custody in New Albany, Indiana, and remained a fugitive until his capture in Connecticut on November 9, 1978. He has since remained in federal custody. The instruments that Thevis executed during April 26–28, 1978, he signed in contemplation of that escape.

48. On June 10, 1978, Mr. Thevis, Global, Fidelity and others were indicted on various federal criminal charges including RICO offenses in this Court in Criminal No. 78–180A (Fidelity was subsequently acquitted).

49. Subsequent to that indictment, and after an order of this Court, the United States released to counsel for Global a copy of the lengthy statement given to the Government by witness Roger Underhill. At the time of his later capture, Mr. Thevis had in his possession a copy of the Underhill statement, which copy was itself a copy of the document provided to Global.

50. At the time large jeopardy assessments were made on August 9, 1978, against Fidelity, Global, and Thevis, and a notice of federal tax lien was duly recorded against Global in the Fulton County land records on August 10, 1978, Global owned and had its chief offices at 267 Marietta Street, Atlanta, Georgia. A senior deed to secure debt on those premises was held by the Federal Deposit Insurance Corporation, as successor to Hamilton Bank and Trust Company. A second deed to secure debt was held by Georgia Ann Harmon, as trustee of the alimony trust, and as assignee of Michael Thevis, to secure Fidelity's obligation to him.

51. During 1976 through 1978, Laverne Bowden remained in day-to-day control of Global Industries, Inc. with her office at the Marietta Street property. She was responsible for the periodic payments made to the Thevis' family or to the trusts, pursuant to the sale documents. Late in 1978, she took a series of steps adverse to the interests of Fidelity or Global, which she purported to own.

52. During late 1978 and early 1979, Ms. Bowden, acting through a nominee, set up a California corporation, "Jerry's G & G, Inc.," and moved Fidelity money and assets to San Francisco, to establish a business under that name. For public purposes, Ms. Bowden represented that she was negotiating and dealing with Jerry's G & G at arm's length, and that the transfer of Fidelity assets was for the benefit and advantage of Fidelity.

53. In the summer of 1979, immediately prior to the commencement of the lengthy criminal trial in this Court in Criminal No. 78–180A, Thevis sent word to Ms. Bowden that she was terminated or fired, and she should leave. Ms. Bowden then immediately vacated Fidelity offices, and never returned. Subsequently, Ms. Bowden commenced a civil suit against Fidelity, to recover certain wages for which payment on her paychecks had been stopped.

54. Although Ms. Bowden had personally guaranteed all of the Fidelity indebtedness to Mr. Thevis, for its purchase of Global, to date no suit ever has been commenced on those guarantees against Ms. Bowden, either by Mr. Thevis or by the trustee (who was assigned the notes).

55. Following Ms. Bowden's departure, Ralph Mitchum took nominal control of Fidelity, but left after several months, at the direction of Mr. Thevis. Thereafter Lynda Ivy purported to controll Fidelity Equipment Leasing Corp.

56. Beginning in 1979 Lynda Ivy, operating under the guise of "Ibron Industries" and related entities, began to acquire Fidelity retail outlets (book stores) as their leases expired, through sales agreements with Fidelity. Her actions in this regard were known to attorneys for Fidelity/Global, and came to the attention of Mr. Thevis. Inasmuch as Lynda Ivy was acting apparently on her own behalf, Mr. Thevis asked that she visit him in federal prison, and she did so, and he then demanded an interest in Ibron, in terms which Ivy understood as threatening.

57. In 1979, Mr. Thevis stood trial before this Court on major criminal charges, along with Anna Jeanette Evans, A. Bart

Hood, and Global Industries, Inc; see *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982). During the course of that trial, Georgia Ann Harmon used trust moneys to pay Thevis' legal expenses, and moreover permitted certain assets of the alimony trust (life insurance policies) to be used as collateral to borrow money to pay Thevis' expenses. That action was an abuse of the alimony trust, inasmuch as Thevis was unable to pay interest on the policy loan, as required by the trust instrument.

58. During the same time, assets of Global Industries, Inc. were also sold, specifically real property in New Orleans owned by a Global subsidiary (Amphora Holding) and Global's interest in Cinema Classics, a California movie production firm. Proceeds of the sales were used in part to defray Michael Thevis' legal expenses. The trustee, Georgia Ann Harmon, on behalf of Amphora Holding, executed the documents for that sale, presumably on the basis that the alimony and children's trusts were then in control of Fidelity/Global.

59. In June 1980, almost a year after Ms. Bowden's departure from Fidelity/Global, Georgia Ann Harmon sent her a letter notice, stating that Fidelity Equipment Leasing Corp. was delinquent on its obligations to the alimony and children's trust, and announcing that pursuant to the default provisions of the sales agreements, all of the stock in Fidelity had vested in Georgia Ann Harmon as trustee, as of 1979, and that as sole shareholder she (Harmon) would and could elect directors, appoint officers, and otherwise direct the affairs of Fidelity/Global. This notice constituted an attempted rescission of the 1974–1978 sale of Global to Fidelity.

60. During the period of time from 1979 through 1981, during which Fidelity/Global was under the purported control of the trusts, one Fidelity affiliate was making periodic support payments to Thevis' co-defendant Anna Jeanette Evans, and another affiliate was carrying the wife of Thevis' co-defendant Bart Hood on its payroll, and still another affiliate was carrying Thevis'

adult son on its payroll, when neither had any duties nor did any work for their paychecks. These support payments for these three individuals were made for the benefit of Michael Thevis, and were undertaken at the direction or with the connivance of Thevis and Georgia Ann Harmon, the trustee. These payments constitute an abuse of the corporate entities for Thevis' benefit, and an abuse of the trust to the extent the trusts permitted the payments to take place. Georgia Ann Harmon was herself among the persons who delivered cash to Jeanette Evans, so that the trustee had actual knowledge of an abuse of corporate monies.

61. In March 1981, subsequent to entry of an order of this Court in related litigation, the Internal Revenue Service seized and sold all of the assets of Global/Fidelity, and terminated its business. At that time Fidelity ceased all payments to the two trusts on Notes A and B, thus ending alimony payments to Joan Thevis (now Coffman), so that Thevis went into default on his $12,000 per month alimony obligation with his ex-wife.

62. In the 1979 criminal trial, Thevis was convicted of racketeering, a part of which charge involved the 1970 murder of one Kenneth Hanna. The defendant Global Industries, Inc. was also convicted of that homicide, on the basis that Global Industries, Inc. was the alter ego of Thevis. Pursuant to that conviction, Global was sentenced to forfeit its interest in 267 Marietta Street. Shortly thereafter, Global Industries, Inc. failed to make its regular mortgage payment to the Federal Deposit Insurance Corporation, successor to Hamilton Bank and Trust, so that on January 1, 1980, the FDIC exercised its power of sale in its deed to secure debt, and the premises were sold at public outcry. After that sale, and the application of the proceeds to the indebtedness owed to the FDIC and to the expenses of the sale, there remained the sum of some $360,000, which on February 19, 1980, the FDIC interpleaded into this Court by commencement of this action.

The FDIC was thereafter discharged and dismissed.

63. Among those claims filed against the funds were those of (a) the United States, pursuant to the federal tax liens and the forfeiture decrees, (b) Georgia Ann Harmon, as trustee holding by assignment of the second deed to secure debt, and (c) Joan Thevis, now Joan Coffman, as a beneficiary of that alimony trust. Georgia Ann Harmon, as trustee, thereafter defaulted, so that Joan Coffman as a beneficiary was permitted to proceed herein on the trust's behalf.

64. At the time of the sale by FDIC and the commencement of this action, Thevis was in reasonable compliance with his alimony obligations, through the mechanism of the alimony trust, so that Joan Thevis, now Coffman, as a beneficiary, did not have any current claim against the corpus, or principal, of the trust. That claim did not mature until later, after the IRS seizure in 1981.

65. Georgia Ann Harmon acted as Trustee for the Alimony Trust and Irrevocable Living Trust. She did so at the request of Michael G. Thevis, and generally, relied upon the advice of attorneys in performing her duties as Trustee.

66. Ms. Harmon's principal concern as Trustee was in attempting to ensure that the payments on the promissory notes which funded the trusts were made in full and in a timely fashion.

67. A question was posed by the Court during the testimony of Mr. Morton Levine relative to the execution of the Settlement Agreement. That is, whether the agreement (the original of which is in evidence) was the same agreement which was carried to the New Albany, Indiana jail by attorney Warren Shulman for Michael G. Thevis' signature on or about April 26, 1978. This issue had arisen by virtue of Mr. Shulman's testimony that there was some disagreement between Thevis and himself relative to those assets comprising the settlement with his soon to be ex-wife, Joan Thevis Coffman, though the time of such disagreement was not revealed in Shulman's testimony.

68. Mr. Levine testified that the original Settlement Agreement, including the exhibits thereto, was prepared in Levine's office and it was in fact the agreement which Levine prepared that was executed first, by Thevis in the New Albany, Indiana jail, and subsequently in Atlanta by claimant Joan Thevis Coffman. Additionally, it was Mr. Levine's testimony that he was not shocked or amazed by the contents of the agreement that was returned to him executed by Thevis, and that what in fact was agreed to was arrived at after many long months of hard negotiation with Mr. Shulman.

69. Morton Levine testified that he spent many hours working on this case and that he thoroughly reviewed the various form books and other authorities which might aid him in this responsibility to his client to see that all avenues regarding alimony and child support were exhaustively considered in the Settlement Agreement. It was his further testimony that at no time was he aware of any intent on the part of either Michael or Joan Thevis to in any way collude or act in a fashion so as to defraud creditors. His stated position simply was that it was his duty to obtain for his client and her children as much of Thevis' assets as he could possibly obtain for her, realizing all the while he would never know the extent of his success because he felt he would never know the extent of Michael G. Thevis' holdings at the time of the divorce.

## CONCLUSIONS OF LAW

1. Under Section 6151 of the Internal Revenue Code, regardless of when federal taxes are actually assessed, the taxes are considered as due and owing, and constitute a liability as of the date the tax return for the particular period is required to be filed. *United States v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla.1977), aff'd 576 F.2d 650 (5th Cir.1978), cert. denied, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979); *United States v. Adams Building Company*, 531 F.2d 342 (6th Cir.1976);

*United States v. Hickox,* 356 F.2d 969 (5th Cir.1966); *Hartman v. Lauchli,* 238 F.2d 881 (8th Cir.1956), cert. denied, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957). *See United States v. Chapman,* 84–1 U.S. T.C. (1984). Federal tax *liens,* however, do not come into existence until the dates of assessment, notice, and demand for payment. Therefore, federal tax liens did not attach until, in this case, after the property in question was transferred. In this situation, the Government's remedy is to seek relief under the fraudulent conveyance laws of the state in which the taxpayers and property are located—in this case, the law of Georgia. *United States v. Ressler, supra; Noonis v. United States,* 576 F.Supp. 853 (W.D.Texas 1983); *United States v. Grice,* 567 F.Supp. 113 (M.D.Ala. 1983).

The principal transfers in this case which are the subject of inquiry are the Global Industries Security Deed to Michael G. Thevis, and the assignment of the $2,000,-000.00 Promissory Note and this Deed to the Alimony Trust as part of the divorce settlement. Therefore, the appropriate remedy for the Government is the fraudulent conveyance statute of the state of Georgia, and it is by this and related statutes that the transfers must be analyzed by the Court.

2. The parties agree that "record" title to the fund interpled into this Court has vested in Joan Thevis Coffman by reason of the second mortgage to which she is beneficiary on the 267 Marietta Street, Atlanta, Georgia property which was foreclosed by the FDIC as successor to the Hamilton Bank and Trust Company acting under the power in its first mortgage.

3. The Government seeks to set aside Ms. Coffman's claim to the corpus by virtue of its claim that her interest is subject to being set aside because the transactions by which she gained title were fraudulent under the terms of the Georgia fraudulent conveyance statute (O.C.G.A. § 18–2–22 (Michie 1982) (formerly Ga.Code Ann. § 28–201)) which provides as follows:

The following acts by debtors shall be fraudulent in law against creditors and others, and as to them null and void:

(1) Every assignment or transfer by a debtor, insolvent at the time, of real or personal property or choses in action of any description to any person, either in trust or for the benefit of or on behalf of creditors, where any trust or benefit is reserved to the assignor or any person for him;

(2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the creditor, shall be valid; and

(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

In this Court's order of September 1, 1981 this Court stated that under the statute, the three enumerated "acts" each contain two components:

18–2–22(1): (a) insolvent debtor; (b) trust or benefit is reserved to the debtor

18–2–22(2): (a) debtor's intent to delay or defraud creditors; (b) assignee's knowledge of debtor's intent

18–2–22(3): (a) insolvent debtor; (b) conveyance or assignment not supported by valuable consideration

This Court's order of September 1, 1981 did not adequately detail the components in that O.C.G.A. § 18–2–22(2) contains the following components

(a) debtor's intent to delay or defraud creditors; and,

(b) assignee's knowledge of debtor's intent, or the assignee had reasonable grounds to suspect that such was his object.

*Smith v. Wellborn,* 75 Ga. 799 (1885).

4. The law in Georgia is clear that the fraudulent conveyance statute and the in-

nocent subsequent purchaser statute should be considered *in pari materia.* *Warren v. Citizens National Bank,* 145 Ga. 503, 504, 89 S.E. 520 (1916); *Hinkle v. Smith,* 133 Ga. 255, 65 S.E. 427 (1909). *See Sawyer v. Almand,* 89 Ga. 314, 15 S.E. 315 (1892).

Georgia's innocent subsequent purchaser statute codified as O.C.G.A. § 18–2–23 provides:

> Where a sale void as against creditors is made, the property has not been seized, and no step has been taken to set the sale aside, the fraudulent vendee can convey to an innocent purchaser from him, for value and without notice of the fraud, a title good as against the claims or judgments of the defrauded creditors.

■ 5. Under Georgia law where a sale is attacked by creditors as fraudulent, to be protected, the purchaser from the seller with fraudulent intent must be without notice or grounds for reasonable suspicion. *Nicol & Davidson v. Crittenden,* 55 Ga. 497 (1875); *Smith v. Wellborn, supra; Palmour v. Johnson,* 84 Ga. 91, 10 S.E. 500 (1889); *Bigby v. Warnock,* 115 Ga. 385, 41 S.E. 622 (1902). If the conveyance from the fraudulent debtor to the first grantee is void because of fraud on the creditor, and a second grantee takes with notice of the fraud, then the conveyance to the second grantee is also void, even if the second grantee has paid a valuable consideration for the property. If, however, the second grantee has only reasonable grounds for suspicion, but is without notice of the fraud, such does not render the title of the second grantee void. *Hinkle v. Smith,* 133 Ga. 255, 65 S.E. 427 (1909); *Warren v. Citizens National Bank,* 145 Ga. 503, 89 S.E. 520 (1916). "A bona fide transaction on a valuable consideration, and without notice or grounds for reasonable suspicion" may not, of course, be set aside upon a claim of fraud. *Conley v. Buck,* 100 Ga. 205, 28 S.E. 97 (1896).

6. As the Government acknowledged upon oral pre-trial, it has the burden of proof in so far as those transfers it claims were fraudulent conveyances. It is there-fore incumbent upon the Government to prove those two components of each of at least one of the three sections of the fraud-ulent conveyance statute as identified by this Court in its order on Joan Coffman's motion for summary judgment, (Order of September 1, 1981, p. 3), and as amplified in this order.

It is a fundamental rule of law that the party seeking to "upend" a transaction as fraudulent against it as a creditor has the burden of proof. *Owen v. S.P. Richards Paper Co.,* 188 Ga. 258, 3 S.E.2d 660 (1939); *Webb-Crawford Co. v. Bozeman,* 178 Ga. 328, 173 S.E. 144 (1934).

■ 7. It is true, however, that. in a conveyance between husband and wife that the transactions are to be scrutinized more closely, and the burden is upon the hus- band and the wife to prove their good faith. *United States v. McMahan,* 392 F.Supp. 1159 (N.D.Ga.1975), aff'd, 556 F.2d 362 (5th Cir.1977). Joan Coffman contends that if this transaction is regarded as one between husband and wife that sufficient evidence of good faith has been presented to carry that burden. Assuming this is not a trans-fer between husband and wife, but be-tween Michael G. Thevis and the Trust or its Trustee, then the burden of proof lies entirely with the Government in proving a fraudulent conveyance.

8. The United States contends that Fi-delity Equipment Leasing Corp. and La-verne Bowden served as the alter ego or nominee of Michael Thevis, so that the transactions among them are of no force and effect.

Generally, a corporation is a legal entity separate and distinct from its officers, stockholders and agents. "But where the corporate fiction is a mere simulacrum, an alter ego or business conduit of an individu-al, it may be disregarded in the interest of securing a just determination of the ac-tion." *Mayo v. Pioneer Bank & Trust,* 274 F.2d 320 (5th Cir.1960). The separate-ness of the corporation may be disregarded "where such corporation has overextended its privileges in the use of the corporate entity to defeat justice, to perpetrate fraud,

or to evade statutory, contractual or tort responsibility" *West Broadcasting v. Barrington,* 167 Ga.App. 301, 306 S.E.2d 320 (1983). Piercing of the corporate veil is permitted "where the parties involved have themselves disregarded the separateness of legal entities by a commingling and confusion of properties, records, control, * * * [and when it is obvious that] the individual who is the principle shareholder or owner of the corporation conducts his private and corporate business on an interchangeable or joint basis as if they were one, * * * [then, that individual] is without standing to complain when an injured party does the same." *Bone Construction Co. v. Lewis,* 148 Ga.App. 61, 250 S.E.2d 851 (1978).

■ 9. Courts will also disregard the corporate fiction where the corporate entity is a mere alter ego or business conduit of an individual. *Jones v. Cranman's Sporting Goods,* 142 Ga.App. 838, 237 S.E.2d 402 (1977). "To establish the alter ego doctrine, it must be shown that the stockholder's disregard of the corporate entity made it a mere instrumentality for their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist, and to adhere to the doctrine of corporate entity would promote injustice or protect fraud." *Farmers Warehouse of Pelham v. Collins,* 220 Ga. 141, 137 S.E.2d 619 (1964); *Williams Plaza, Inc. v. Sedgefield Sportswear, Division of Blue Bell, Inc.,* 164 Ga.App. 720, 297 S.E.2d 342 (1982); *In re Universal Profile, Inc.,* 6 B.R. 196, 201 (N.D.Ga.1980); *Trans-American Communications, Inc. v. Nolle,* 134 Ga.App. 457, 214 S.E.2d 717 (1975). Other facts indicating that a corporate entity is an alter ego are the commingling of an individual's property, business, or personal affairs with that of the corporation, or that of the corporation with the individuals. *Stillman v. Tempo Carpets,* 174 Ga.App. 66, 329 S.E.2d 197 (1985).

10. Where corporate form is abused, so that the rights of creditors are damaged, the courts have not hesitated to disregard the corporate device, and to frame an appropriate remedy. Instances in which the federal courts have acted to set aside corporations formed to frustrate tax collection include *Valley Finance, Inc. v. United States,* 629 F.2d 162 (D.C.Cir.1980), cert. denied sub nom. *Pacific Development, Inc. v. United States,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *G.M. Leasing Corp. v. United States,* 514 F.2d 935 (10th Cir.1975), reversed in part on other grounds, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); and *Avco Delta Corp. Canada Limited v. United States,* 540 F.2d 258 (7th Cir.1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1976).

11. The burden is upon the proponent, to establish by a preponderance of the evidence that the corporation is a sham designed to execute illegitimate purposes in the abuse of the corporate fiction and the immunity that it carries. *Maule Industries v. Gerstel,* 232 F.2d 294, 297 (5th Cir.1956); *In re Kirk Kabinets,* 393 F.Supp. 798, 803 (M.D.Ga.1975); *Coryell v. Phipps,* 128 F.2d 702, 704 (5th Cir.1942), aff'd on other grounds, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

■ 12. The concept of piercing the corporate veil, or disregarding the corporate entity is appropriate where an individual or a corporation has over extended his or its use of a corporate entity in order to defeat justice, to perpetuate fraud, or to evade contractual or tort liability. Whether or not the corporate entity should be disregarded depends upon the particular circumstances involved. *Jones v. Crauman's Sporting Goods, supra.*

■ Although great caution should be exercised in disregarding or going behind the corporate entity, it may be done when the subsidiary is shown to be the alter ego or business conduit of the parent. It must be shown, however, that the subsidiary is a mere instrumentality of the parent, that the separate personalities of the corporation and the parent no longer exist, and to adhere to the doctrine of corporate entity would promote injustice or protect fraud. *Trans-America Communications v. Nolle,*

134 Ga.App. 457, 460, 214 S.E.2d 717 (1975); *Florida Shade Tobacco Growers, Inc. v. Duncan*, 150 Ga.App. 34, 256 S.E.2d 644 (1979).

■ 13. The evidence is compelling that Ms. Bowden and Fidelity Equipment Leasing Corp. were alter egos of Michael Thevis. No stock was ever formally issued to Ms. Bowden in Fidelity Equipment Leasing Corp. and she was effectively terminated as president of Fidelity by Mr. Thevis in 1979. Even though she claimed to own the corporation, she filed a lawsuit against it for unpaid salary. Corporate formalities were not observed in that there were no corporate officers between 1979 and 1981. Payments were made by Fidelity to Mr. Thevis' co-defendant in the criminal action in this court, Jeanette Evans, to the wife of Bart Hood, with Bart Hood being another co-defendant in the criminal action in this court and to Michael G. Thevis, Jr., none of whom performed any work for Fidelity Equipment Leasing Corp.

Even though in prison, Mr. Thevis remained in communication with the business. Leon Walters and Patricia McLean were employed to look after Mr. Thevis' interests. Mr. Thevis told his associates, Roger Underhill and Leon Walters, that the Fidelity transaction was a front or a sham. The transactions between Mr. Thevis, Global Industries, Inc. and Fidelity Equipment Leasing Corp. appeared to be restructured whenever it suited Mr. Thevis' interest to so do.

Other facts, not at all exhaustive of those in the record, showing Mr. Thevis remained in control of Global Industries, Inc. and Fidelity Equipment Leasing Corp. is the sale of assets for payment of legal fees in late 1979, such as the sale of the Amphora Holding property in New Orleans and Cinema Classics.

■ Proof of the alter ego relationship consists substantially on how the controlling person treated the disputed entity, *United States v. Thevis*, 665 F.2d 616, 646 n. 37 (5th Cir.1982). Clearly Fidelity Equipment Leasing Corp. and its subsidiary, Global Industries, Inc. were the alter ego of Michael Thevis.

14. Upon the trial of this case, the United States proffered a theory relative to the conveyances by Michael G. Thevis to the trust under which Joan Coffman claims. In effect, the Government contends that the creation of the trust by Michael G. Thevis was to himself or his Trustee, Georgia Ann Harmon, or to his trustee and himself for a fraudulent purpose. The Government has contended throughout this litigation that Joan Coffman is a contingent beneficiary of the trust and her right to litigate on behalf of the trust has been upon default of the legal Trustee, Georgia Ann Harmon, and that she stands strictly in the shoes of the Trustee, and is otherwise bound by any notice sent to or findings against Georgia Ann Harmon.

15. If, then, Georgia Ann Harmon is determined to be Michael G. Thevis' grantee, it is Joan Coffman's position that like herself, Georgia Ann Harmon took without notice of the fraudulent intent, if any, of Michael G. Thevis, and that therefore the transaction under the fraudulent conveyance statute is valid as against those creditors claiming thereunder. If, on the other hand, the conveyances were in fact to Thevis or his Trustee for the purpose of defrauding his creditors, it is Joan Coffman's position that under O.O.G.A. § 18–2–23 (Michie 1982) (formerly Ga.Code Ann. § 28–202) that she should recover as an innocent purchaser from Thevis (or the Trust) for value, and without notice of any fraud.

16. It is fundamental that under trust law in creating a trust, the legal title of the property conveyed vests in the trustee, and the equitable or beneficial title vests in the beneficiary or beneficiaries for whom the trust was created. *Mason v. Young*, 203 Ga. 121, 122, 45 S.E.2d 643 (1947); *Beal v. Crafton*, 5 Ga. 301, 305 (1848); Redfearn Wills and Administration in Georgia, 4th Edition, Section 185. Accordingly, in most circumstances the trustee, as holder of legal title is the proper party to any proceeding. *Beal v. Crafton, supra.*

17. As the Government has pointed out, however, where the trustee has defaulted or abandoned the action, it is appropriate for the beneficiary to become a party to protect those interests not represented or protected by the trustee. IV Scott, The Law of Trusts, § 282.1 (1967); Redfearn, *supra*, § 210. In this action, Georgia Ann Harmon, Trustee of both the Alimony and Irrevocable Living (Children's) Trust, was an original party defendant. However, Ms. Harmon's attorney has long since withdrawn, and she has taken no active part in this litigation since that time. Therefore, Joan Coffman has, as a beneficiary of the Trust, sought to protect those rights of the Trust and those rights afforded her under the Trust.

18. As the conveyances which establish the Trust were to Ms. Harmon as Trustee, her knowledge and notice of certain facts is relevant in the Court's consideration under O.C.G.A. § 18–2–22. Additionally, as both § 18–2–22 and § 18–2–23 must be read together and considered *in pari materia*, the knowledge of Joan Coffman becomes relevant for purposes of determining whether or not she is an innocent purchaser for value and without notice under O.C.G.A. § 18–2–23. Therefore, both Ms. Coffman's knowledge and that of her Trustee are relevant in this case and should be considered by the Court.

19. At the time of the transaction at issue in this case, Global Industries, Inc. was indebted to the United States for more than ten million dollars, which it was unable to pay and was insolvent. An adverse jury verdict had just been returned against Mr. Thevis, personally, in the amount of $670,000.00. At the same time, he was being investigated by a federal grand jury, from which subsequent RICO and other charges were made; at the same time Mr. Thevis was indebted to the United States in the amount of more than $2.5 million for income taxes. At least on paper, he owed Global Industries, Inc. a million dollars. Much of his assets were hidden from creditors and his wife's attorney. Mr. Thevis' interest in hidden jewelry, hidden cash, and in the "George Thevis" Trust were not available to creditors and may not be considered in support of his solvency. 37 C.J.S., *Fraudulent Conveyances*, § 105. At the time of execution of the documents he had a present intention to escape prison and he was legally insolvent. The mortgage was a fraud on creditors by Michael Thevis and his alter ego in violation of O.C.G.A. 18–2–22.

20. The transfer by Michael Thevis of the Global mortgage to the alimony trust was a fraudulent transfer. Thevis was then indebted to the United States for income taxes for more than $2.5 million, and had just suffered an adverse jury verdict of $670,000.00. He owed Global Industries, Inc. another one million dollars. He gave away all of his visible assets except the Valley Tarn residence, and thereby rendered himself insolvent. Michael Thevis retained a major interest in the alimony trust, in that (a) he was the primary beneficiary of income distributions unless he defaulted on the alimony payments, (b) he could borrow against the cash value of the insurance policies assigned over to the trust, provided that he pay interest on the loans, and (c) the corpus of the alimony trust reverted to him or his estate upon Joan's death. Therefore, the assignment of the mortgage to the alimony trust constituted a transfer by an insolvent with a "trust or benefit" reserved to the transferor, voidable under O.C.G.A. § 18–2–22(1).

21. The deed to secure debt on 267 Marietta Street, from Global Industries, Inc. to Michael Thevis, was assigned by Mr. Thevis over to the alimony trust. Joan Thevis, now Coffman, as a contingent beneficiary of that trust, claims that she (or the trust) takes free of any taint of fraud, as a bona fide purchaser, or innocent purchaser for value. The Government disputes this claim. The legal standard, which arose out of Code of former Georgia Ann., Section 28–201(2), now O.C.G.A. § 18–2–22(2) is that the transfer may be set aside if the transferee had reasonable grounds to suspect the motives of the transferor, *Cunningham v. Avakian*, 192 Ga. 391, 15

S.E.2d 493 (1941); *United States v. McMahan*, 392 F.Supp. 1159 (N.D.Ga.1975), rev'd on unrelated grounds, 569 F.2d 889 (5th Cir.1978).

22. Looking to the settlor and primary beneficiary of the trust, Michael G. Thevis, not only did he establish the trust, but received all the benefits of the trust so long as his alimony was paid to Joan Thevis, now Coffman. Clearly the fraudulent intent of the settlor, Michael Thevis, was known to the primary beneficiary of the trust, Michael Thevis.

23. The trustee, Georgia Ann Harmon, is a first cousin of Michael Thevis and is considered by him to be as a sister. She has always acted in Thevis' behalf and for his benefit. She personally made delivery of monies to Jeanette Evans, a codefendant in various criminal charges before this Court, she participated in the sale of Amphora Holding Property and used monies from insurance policies in the trust to help pay Mr. Thevis' legal expenses.

The assignment to the alimony trust, though contemplated by the Settlement Agreement, was effected by an assignment actually signed by Georgia Ann Harmon pursuant to the power of attorney she held. This assignment was apparently signed after Michael Thevis was on escape status. Although it bears the typed date of April 28, 1978, the date Thevis escaped, it was apparently signed the following week. Government Exhibits 74 and 75, are similar assignments executed by Georgia Ann Harmon on Mr. Thevis' behalf. They are in the identical format and have the same witness as the assignment to the trust. These latter assignments bear May 1978 dates. Nothing was formally recorded until May 8, 1978 and all appear to have been executed at the same time. When the trust received actual "title" to this property interest, it or its representative had notice that Thevis had escaped. Any interest received from a fugitive is *ipso facto* suspect.

Mr. Thevis' problems with criminal and civil prosecutions were highly publicized in the Atlanta news media well before April 28, 1978. The details of his various legal problems were regularly reported by the Atlanta news media in detail. It is unreasonable to believe that his foster sister, in whom he would ultimately entrust all his apparent business holdings had no knowledge of such reports when the record before the Court is replete with copies of newspaper reports detailing such problems.

Clearly, if Georgia Ann Harmon was without knowledge of the fraudulent intent of Michael Thevis, she was possessed of reasonable grounds for suspicion thereof at the time she took the assignment of the trust, whether it be before the escape on the night of April 28, 1978 or in May 1978, when it appears she actually made the assignment as attorney in fact for Mr. Thevis.

24. The Government contends that Ms. Thevis, now Coffman, had no interest in the proceeds of the mortgage until 1981, when her alimony payments ended. She collected her alimony until 1981. At the time the monies before the Court were generated there was no default in the alimony payments to Ms. Coffman.

In accordance with the terms of the trust and alimony agreement the right of Ms. Coffman to encroach upon the corpus arose only when her alimony stopped. Any right she had to proceed against the corpus arose in 1981 when her alimony payments stopped. The rights of Ms. Coffman against the corpus of the trust were contingent or inchoate until the default in her alimony payments.

The contractual obligation of Michael Thevis to pay Joan Coffman $12,000.00 per month alimony was not a lien or security interest subject to levy or like claim against the mortgage and funds now before the Court. Indeed there is no evidence that Ms. Coffman has ever reduced her claim for unpaid alimony to a writ of execution as is provided for under Georgia law.

At the date this case was brought and the monies before the Court were generated Ms. Coffman had only a contingent or inchoate claim to the funds. At that time

the Government's tax liens and the decree of forfeiture were of record and take priority over Ms. Coffman's claims.

25. Ms. Coffman claims that she must be awarded the fund of money now before the Court on the grounds that, even if it were the product of a series of sham or fraudulent transactions, she nonetheless qualifies as a "bona fide purchaser," who takes free of the prior taint.

■ She contends that she sought, and eventually obtained, a legitimate, enforceable divorce from Michael Thevis, that she sought an equitable distribution of marital property, and that she released and abandoned any other rights in exchange for the alimony and property granted her in the settlement. A marital settlement, whereby a spouse transferee releases marital rights, is actual consideration. See *Marine Midland Bank v. Batson,* 70 Misc.2d 8, 332 N.Y.S.2d 714 (1972); *Smith v. Denaburg,* 283 Ala. 509, 218 So.2d 838 (1969). The Government contends that Ms. Coffman had full notice of possible claims, that she was herself involved in the entities that generated these claims, and that therefore she may not qualify as a bona fide purchaser.

The Government contends Ms. Coffman was placed on notice that the mortgage interest transferred to the alimony trust was the result of a sham, and that Michael Thevis was attempting to defeat his and Global's creditors.

■ As of the date of the assignment of the deed to secure debt Ms. Coffman either had notice or reasonable grounds for suspicion of at least the following:

(a) That Michael Thevis was a federal prisoner, and thus was under various legal disabilities.

(b) That having assigned Notes A and B to the alimony and inter vivos trusts, Mr. Thevis had no visible means of income to pay his alimony obligation.

(c) That Michael Thevis had hidden assets. Both Ms. Coffman and attorney Morton Levine testified that they knew or honestly suspected that Thevis had hidden assets. Thus Ms. Coffman was on notice that Thevis had a present intention to prevent others from locating his assets.

(d) Mr. Thevis had suffered an adverse $670,000.00 jury verdict; this was reported in the April 23, 1978, *Atlanta Constitution.*

(e) Criminal charges had been - filed against Mr. Thevis by the State of Florida, and he was subject to an ongoing federal grand jury investigation in Atlanta, Georgia. Knowledge of possible criminal conduct by the transferor puts the transferee on notice of the former's possible fraudulent intentions, *Duncan v. First National Bank Of Cartersville,* 597 F.2d 51, 56 (5th Cir.1979).

(f) A lengthy civil tax investigation was underway. Ms. Coffman had executed a power of attorney appointing T.D. James to represent her, had extended statutes of limitations, and had turned over family financial records to the Internal Revenue Service, so that she knew that the returns were being investigated. T.D. James knew, too, that the IRS was engaged in an extensive examination of Fidelity/Global.

(g) Ms. Coffman reaffirmed Thevis' description of himself as "Supreme Head." She had full notice of his capacity and intent to manipulate assets, people, and legal entitles for his own personal benefit, and hence she was on reasonable notice that Thevis was manipulating Global and Fidelity and their assets for his own purposes, and that the Thevis/Fidelity sale was a sham.

(h) Ms. Coffman had made an initial demand upon Thevis for a two million dollar lump sum settlement. After six months' negotiations, she got more than that. She received the mansion, other valuable land in Florida and in Clayton County, Georgia and Bartow County, Georgia, a stock portfolio, and substantial life insurance policies. In addition, and as required under the Settlement Agreement, life insurance policies were transferred to the alimony trust and the separate children's trust. Thevis'

record interest in Global—the two promissory notes—were also assigned over to the trusts. Thevis had thus denuded himself of all visible assets, save only the Valley Tarn residence, and Ms. Coffman and her agents were on notice thereof. The Valley Tarn residence was retained by Thevis (and eventually sold by IRS). Other Thevis assets, hidden cash, cash deposited abroad, and jewelry, were secreted beyond the inquiring eye of creditors, investigators or Ms. Coffman's attorney. Other than Valley Tarn Ms. Coffman had all visible assets of Mr. Thevis except the inter vivos trust, which was of little value.

26. Michael G. Thevis, an insolvent debtor, created a trust in which he was the primary beneficiary. Same was done for a fraudulent purpose, i.e., to defraud creditors and is void pursuant to O.C.G.A. § 18–2–22(1).

27. The transactions described in the Court's findings of fact which occurred in 1974, 1975 and 1977 and described as the "first transaction" the "second transaction" and the "third transaction" and the transactions of March 1978 and the recasting of the promissory notes and the creation of the second security deed against the property located at 267 Marietta Street in Atlanta, Georgia were each and all done by Michael G. Thevis with the intent and for the purpose of delaying and defrauding creditors in violation of O.C.G.A. § 18–2–22(2).

28. The creation of Fidelity Equipment Leasing Corp., the placing of Laverne Bowden in charge thereof and the various transactions with and by that corporation with Michael G. Thevis and Global Industries, Inc. and various subsidiaries were all done with the intent by Michael G. Thevis to delay or defraud creditors in violation of O.C.G.A. § 18–2–22(2).

29. The relevant date as to knowledge of the assignee, Joan Thevis, now Coffman, or Georgia Ann Harmon, the trustee, to the extent applicable is April 1978, or May 1978, the date of the conveyance placing an interest in either or both of the individuals as contingent beneficiary of the trust or as trustee.

30. While the Court has found a number of facts concerning the trustee's breach of her fiduciary duty as trustee, after she became trustee, these facts are relevant only as evidence of her cooperation in the fraudulent purpose of the trust.

31. It is clearly evident that both the trustee, Georgia Ann Harmon, and the contingent beneficiary of the trust, Joan Thevis, now Coffman, each had reasonable grounds to suspect that the purpose of the second security deed against the property at 267 Marietta Street, and the assignment thereof to the trust at least, in part, was done with the intent of Michael G. Thevis to delay or defraud creditors in violation of O.C.G.A. § 18–2–22(2).

32. In causing the execution of the Deed to Secure Debt from Global Industries to Michael G. Thevis against the property at 267 Marietta Street, Michael G. Thevis was dealing with himself.

33. The transaction at issue is void in that (1) an insolvent debtor, Michael G. Thevis, created a trust in which a benefit was reserved to the debtor, Michael G. Thevis, in violation of O.C.G.A. § 18–2–22(1); and, (2) Same was done by a debtor, Michael G. Thevis, with intent to delay or defraud creditors, at which time, both assignees, Georgia Ann Harmon, as trustee, and Joan Thevis, now Joan Coffman, as contingent beneficiary of the trust, had reasonable grounds to suspect that his purpose was not only to provide support for his wife, Joan Thevis, whom he was divorcing, but to delay or to defraud his creditors.

34. Neither Georgia Ann Harmon, as trustee, nor Joan Thevis, now Coffman, is a subsequent purchaser entitled to the protections of O.C.G.A. § 18–2–23.

ACCORDINGLY, the transactions at issue are void and set aside; the claims of Joan Thevis, now Joan Coffman, to the proceeds of the sale of the property at 267 Marietta Street, Atlanta, Georgia are denied in that the Court has found the transactions upon which her claim is based to be

invalid; the claims of Joan Thevis, now Coffman to the funds interpled into Court are denied and dismissed; and, the Court will set a further hearing to determine the priorities as to any other claims to the funds now at issue before the Court.