**P.H. GLATFELTER COMPANY**

v.

**Perry J. LEWIS, individually and as representative of all former shareholders of Ecusta Corporation, and The Bank of New York.**

Civ. A. No. 89–0049.

United States District Court,
E.D. Pennsylvania.

Aug. 14, 1990.

Richard Z. Freeman, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff.

Perry J. Lewis by Ann B. Laupheimer, Blank, Rome, Comisky & McCautly, Philadelphia, Pa., and Arthur M. Holtzman, Chicago, Ill., for defendants.

## MEMORANDUM–ORDER

CLIFFORD SCOTT GREEN, Senior District Judge.

### I.

This case presents a unique and interesting question concerning the operation of certain contractual warranties supported by an indemnity agreement and an escrow fund from shareholders of an acquired enterprise, Ecusta Corporation, to the acquiring corporation, Plaintiff P.H. Glatfelter Company. The shareholders warranted, *inter alia*, that Ecusta had paid all income taxes due and owing for the year 1986. Upon investigation, Glatfelter determined that the taxes paid by Ecusta were deficient by the sum of approximately $3.2 million. Glatfelter initiated a claim against the Escrow Fund for the alleged tax deficiency and, thereafter, filed amended tax returns tendering to the respective taxing authorities the deficiencies, including interest, Glatfelter believes were outstanding.

It is undisputed that Glatfelter's actions amending Ecusta's tax returns and tendering payment thereunder were based solely on that corporation's own judgment regarding Ecusta's tax status. Indeed, no governmental agency had filed or served any notices of deficiency regarding Ecusta's 1986 income taxes. For that reason, defendants have refused to satisfy Glatfelter's claim against the Escrow Fund.

Plaintiff filed suit in this court demanding reimbursement from the Escrow Fund. Pending is Defendant Lewis' Motion For Summary Judgment ("Defendant's Motion") alleging that Glatfelter's payment of the avowed deficiency was purely voluntary and not compensable. I find, however, that an official assessment of tax deficiency is not a prerequisite to Glatfelter's claim against the Escrow Fund; therefore, I will DENY Defendant's Motion.

### II.

#### a.

The essential facts are not in dispute. On May 7, 1987, defendant Perry J. Lewis and other shareholders sold all of the stock of Ecusta Corporation to plaintiff, P.H. Glatfelter Company, for approximately

$150 million.[1] In furtherance of the sale of Ecusta shares, plaintiff and the Ecusta shareholders drafted and executed three documents: a Stock Purchase Agreement[2], a "Corporation Agreement"[3], and, an Escrow Agreement.[4] The interplay of these three documents as they affect taxes paid by Ecusta prior to the sale of its stock forms the basis of both the instant litigation and Defendant Lewis' summary judgment motion.

Pursuant to the Corporation Agreement, Ecusta made several representations and warranties to plaintiff. Of particular significance to this action is "Section 3.12 *Tax Matters*," wherein Ecusta warranted, *inter alia*, that:

> (a) The Corporation [Ecusta] has duly and timely filed all tax returns required to be filed by it or for which it may be held responsible, and has paid, or will pay, all taxes shown to be due and payable on such returns, all deficiencies and assessments notice of which has been received by it, and all other taxes, governmental charges, duties, penalties, interest and fines due and payable by it;
> . . .

Additionally relevant to this action is § 3.45 of the Corporation Agreement which assured that the representations and warranties found in the various corporation documents are accurate. Section 3.45 reads in relevant portion:

> . . . To the best of the Corporation's knowledge, the representations and warranties made by the Corporation in this Agreement or in any Schedule or other document furnished by the Corporation do not contain any untrue statement of material fact, or omit to state a material fact necessary to make the statements of

fact contained herein or therein, in the light of the circumstances under which they were made, not misleading. . . .

The second germane corporation document is the Stock Purchase Agreement executed between Glatfelter and each shareholder of Ecusta. Under the terms of that Agreement, until November 7, 1988 when the Agreement expired, the Ecusta shareholders indemnified Glatfelter for losses incurred as a result of any breach of warranty including the warranty set forth at § 3.12 of the Corporation Agreement that Ecusta had fully paid all past due income taxes. Stock Purchase Agreement at § 9.01.[5]

To insure that money was available to cover any valid claims filed by Glatfelter during the life of the indemnity protection afforded under § 9.01 of the Stock Purchase Agreement, the shareholders of Ecusta placed $12 million of the stock sale revenue in an "Escrow Fund" held by an escrow agent, Defendant The Bank of New York. The Escrow Agreement—the third corporation document relevant to this litigation—provides that Glatfelter may recover from the Escrow Fund the amount of any "losses" which are defined in a somewhat circular fashion as "any and all damages, liabilities, losses, costs or deficiencies . . . for which the Shareholders, whether severally or jointly and severally, have agreed to indemnify Glatfelter pursuant to Section 9.01 of the [Stock] Purchase Agreement." Escrow Agreement at § 1.4 and § 2.3.

The above-described indemnity protection was designed to last no longer than eighteen months from the closing date. Thus, the parties do not dispute that the indemnification and representations set forth in the

---

**1.** Mr. Lewis is the designated representative of the former shareholders of Ecusta. See, Stock Purchase Agreement at § 10.01; Escrow Agreement at 5.1. The Stock Purchase Agreement and Escrow Agreement are appended to Defendant's Motion as Exhibits B and C, respectively.

**2.** See footnote 1, *supra*.

**3.** See, Corporation Agreement Between P.H. Glatfelter Company and Ecusta Corporation, Defendant's Motion at Exhibit A.

**4.** See, footnote 1, *supra*.

**5.** In addition, the Stock Purchase Agreement expressly warrants that the Ecusta Shareholders will indemnify Glatfelter for losses regarding, ". . . taxes of any kind whatever, or expenses, interest or penalties relating thereto, . . ." Stock Purchase Agreement at § 9.01(g).

Stock Purchase Agreement expired on November 7, 1988. The Escrow Agreement likewise terminated on that date.

b.

After acquisition, upon conducting a review of Ecusta's financial records and tax returns, Plaintiff Glatfelter concluded that Ecusta had substantially underpaid certain federal and state income taxes for fiscal year 1986. It is undisputed that plaintiff's conclusions are based solely on its in-house review of Ecusta's records which review was not provoked by any known investigation of Ecusta's tax status by the Internal Revenue Service ("IRS") or any of the relevant states' taxing agencies. Indeed, to date no governmental agency has served notice that income taxes paid for 1986 are deficient and owing.[6]

In May of 1988, Glatfelter filed a claim against the Escrow Fund alleging a "loss" predicated on the purported tax deficiency of at least $3,187,722 which, decreased by the $800,000 mandated deductible,[7] totals $2,387,722.[8] Plaintiff predicated its claim against the Escrow Fund upon the theory that the shareholders breached § 9.01(e) and (g) of the Stock Purchase Agreement which indemnifies Glatfelter for losses arising from breaches of the warranties found in the Corporation and the Stock Purchase agreements, including, but not limited to the assurances found that Ecusta had paid all due taxes.

Pursuant to § 3.2 of the Escrow Agreement, Defendant Lewis contested the validity of plaintiff's claim. In light of the dispute over the claim, the Escrow Agent, The Bank of New York, has not tendered reimbursement to Glatfelter; however, funds matching the amount of plaintiff's claim have been reserved in the Escrow Fund.[9]

On November 4, 1988, approximately seven months after initiating its claim against the Escrow Fund, Glatfelter prepared and filed amended tax returns with which it tendered to the respective tax authorities payment, including interest, for the deficiency plaintiff believed to be owing. The former Ecusta shareholders neither approved nor consented to the filing of the amended returns and the payment of purportedly overdue taxes. *See,* Responses Of Plaintiff P.H. Glatfelter Company To Defendant Perry J. Lewis' First Set Of Interrogatories, Question # 3 (affixed as Exhibit H to Defendant's Motion For Summary Judgment) (Hereafter, "Responses Of Plaintiff").[10]

---

**6.** Accordingly, neither have any tax deficiencies been determined by binding administrative or judicial authority.

**7.** The Escrow Agreement establishes a "deductible" consisting of "a Loss or Losses in excess of the Minimum Claim aggregating $800,000." Escrow Agreement at § 1.3. A "minimum claim" is "one or more claims arising out of or involving the same or related factual circumstances, the amount of Loss or Losses in respect of which aggregate is less than 15,000." Escrow Agreement at § 1.5.

**8.** Specifically, the sum represents:

1. Alleged additional federal income tax liability of $2,557,808. Amended Complaint at ¶¶ 26–28;
2. Income tax alleged to be owed to the states of North Dakota and North Carolina in the sum of $208,404. Amended Complaint at ¶¶ 29–32;
3. Ecusta paid no income tax to the State of Georgia. Plaintiff, however, avers that Ecusta may have qualified to do business in that State, thus, it filed a Georgia tax return and paid $71,150. Amended Complaint at ¶¶ 33–35; and,

4. Fees and expenses allegedly incurring in connection with this dispute totaling $350,000. Amended Complaint at ¶ 36.

**9.** By November 7, 1988, all undistributed monies in the Escrow Fund had reverted at fixed intervals to Ecusta shareholders except that, pursuant to § 6.1 of the Escrow Agreement, a portion of the Escrow Fund equal to the amount of Glatfelter's outstanding claim was retained pending resolution of the claim.

**10.** Defendant Lewis stresses that Glatfelter filed the amended returns on November 4, 1988, just three days before Glatfelter's protection under the applicable corporate documents was due to lapse. It appears, however, that from early April, 1988 through October 31, the parties conversed frequently in person, by telephone and through letters regarding Glatfelter's claim against the Escrow Fund premised on Ecusta's alleged tax deficiencies. *See,* Responses Of Plaintiff, Question # 3, at 4–7. According to Glatfelter, Lewis declined Glatfelter's invitation to submit the dispute to the I.R.S. on the ground that "no obligation to indemnify would arise unless Ecusta's tax liabilities were actually paid by November 7, 1988." Glatfelter's Brief at 9.

Plaintiff filed this action alleging two counts of breach of contract.[11] Additionally, Glatfelter seeks a declaration that its claim against the Escrow Fund is valid which would necessitate a determination by this court both whether Ecusta's 1986 tax returns are erroneous and whether Glatfelter's revisions are correct. Glatfelter seeks as well an order enjoining the Escrow Agent to satisfy plaintiff's alleged losses plus an order awarding damages, costs and fees and equitable relief. Defendant Lewis counterclaimed for a declaratory judgment that Glatfelter is not entitled to indemnification regarding the issue of the disputed taxes and requesting an order to release the disputed funds which are still held in escrow. Additionally, defendant counterclaimed for damages and fees resulting from what he purports to be plaintiff's breach of the Escrow Agreement.[12]

Before me is defendant's Motion For Summary Judgment ("Defendant's Motion") asserting that Glatfelter has suffered no loss under the indemnity provision, § 9.01 of the Stock Purchase Agreement. Review of the explicit language of the three corporation documents demonstrates, however, that Glatfelter was entitled to file a claim against the Escrow Fund predicated solely on Glatfelter's payment of taxes and interest which it believed were due and owing. Therefore, Glatfelter initiated a colorable claim against the Fund although, of course, the legal viability of the claim has yet to be determined. As

explicated in detail below, Defendant's Motion must be DENIED.

### III.

#### a.

Resolution of Lewis' contentions, of course, requires review of the three corporation documents' relevant provisions. Before addressing that question directly, the parties differ on a threshold matter namely, the appropriate theoretical framework with which to interpret the documents. Defendant argues that ambiguities, if any, must be construed in favor of the indemnitor. Plaintiff responds that, except in situations in which the indemnitee seeks indemnification from its own negligent acts, the usual rules of contract interpretation apply to indemnity agreements.[13]

█ The corporate documents state that Pennsylvania law governs such questions. See, Corporation Agreement at § 8.01; Stock Purchase Agreement at § 14.01. Consistent with the general tide of indemnity jurisprudence, Pennsylvania holds that the meaning of an indemnity contract is understood by discerning the intent of the parties as manifested from the contract's plain language along with appropriate consideration of the factual circumstances from which the contract emerged. *See, e.g., Brotherton Construction Co. v. Patterson–Emerson–Comstock*, 406 Pa. 400, 178 A.2d 696, 697 (1962); *Urban Redevelopment Authority v. Noralco Corp.*, 281 Pa.Super. 466, 422 A.2d 563, 567 (1980) (*en*

---

Lewis responds that it took no such position. Rather, Lewis contends that his posture is now and has always been that no taxes are due and owing from Ecusta.

Although the parties disagree on the positions each side assumed during these negotiations, there is no doubt that they were unable to agree upon a mechanism to present the tax issue to the appropriate taxing authorities or to otherwise resolve the dispute. Glatfelter determined, therefore, to remit amended tax forms with payments to the respective taxing authorities, evidently in the belief that such action would indisputably preserve Glatfelter's rights to claim a loss against the Escrow Fund.

**11.** Count I is directed to Defendant Lewis as Shareholders' Representative and Court II is addressed to Mr. Lewis individually.

**12.** On April 13, 1990, Glatfelter filed further amended corporate income tax forms reversing its November 4, 1988 amended tax returns and reasserting certain tax computations originally made by Ecusta when Ecusta filed its 1986 taxes. According to plaintiff, "... these amended returns have been filed solely in order to protect Glatfelter's rights under applicable statutes of limitations should this Court determine any of the tax issues in this lawsuit adversely to the positions asserted by Glatfelter." Verification Of Wayne R. Strasbaugh, Esquire, In Opposition To Motion For Summary Judgment Of Defendant Perry J. Lewis at ¶ 2.

**13.** Additionally, plaintiff argues that inferences must be drawn in its favor because plaintiff is opposing a motion for summary judgment.

*banc*); *Deskiewicz v. Zenith Radio Corp.*, 385 Pa.Super. 374, 561 A.2d 33, 35 (1989); *Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409, 1415 (E.D.Pa. 1988); *See also*, 41 Am.Jur.2d, *Indemnity* at § 13, p. 697 (citing, *inter alia*, the Supreme Court of Pennsylvania's decision in *Brotherton Construction Co.*, *supra*.)

The precedents cited in defendant's memorandum of law stand for the inapplicable proposition that indemnity contracts are strictly construed against a party seeking indemnity from his own negligence. *See*, *e.g.*, *Dilks v. Flohr Chevrolet, Inc.*, 411 Pa. 425, 192 A.2d 682 (1963). Thus, Pennsylvania law constrains me to apply the usual and familiar rules of contract interpretation.

b.

■ Defendant Lewis' Motion For Summary Judgment is premised on the contention that no additional corporate income taxes are owing unless and until a competent state or federal authority formally asserts that Ecusta's 1986 tax payments are deficient. Thus, according to defendant, plaintiff's payments to the respective tax authorities was purely voluntary and constitutes no "damage, liability, loss, cost or deficiency"[14] recoverable from the Escrow Fund. The short answer to defendant's argument is that, under the express terms of the Stock Purchase Agreement, neither official assessment by a taxing agency nor determination by a tax court is required for Glatfelter to assert a loss resulting from a claimed tax deficiency.

The indemnity clause of the Stock Purchase Agreement reads in relevant portion:

[T]he shareholder, for a period of eighteen months from the Closing Date, shall, jointly and severally with the other Selling Shareholders, indemnify the Purchaser [Glatfelter] and save and hold the Purchaser harmless from and against any damage, liability, loss, costs or deficiency ... *arising out of, resulting from or related to*, ... *any sum which*

*the Purchaser pays or becomes obligated to pay on account of,*

*... (e) any inaccuracy in any representation or the breach of any warranty of the Corporation under the Corporation Agreement,*

*... (g) any taxes of any kind whatever, or expenses, interest or penalties relating thereto,* which arise out of or result from the transactions contemplated by this Agreement ...

Stock Purchase Agreement at § 9.01 (emphasis added).

The above-quoted language is clear and unambiguous. Glatfelter may seek indemnification for losses[15] resulting from *"any sum which [Glatfelter] pays* or becomes obligated to pay on account of [Ecusta's deficient tax status]."* Albeit on its own initiative, Glatfelter paid more than $3 million covering what it believed to be overdue taxes and interest. Thus, Glatfelter satisfied the requisite of § 9.01 that Glatfelter either pay or become obliged to pay a given sum.

Had the parties wished to limit claims under § 9.01 solely to tax deficiencies either formally assessed by the I.R.S. or determined by a tax court, they could have incorporated an express term to that effect into the Stock Purchase Agreement. Instead, they drafted and executed the above-quoted clause the clear terms of which permit Glatfelter to file a claim concerning a purported tax deficiency although no taxing authority has assessed such a deficiency so long as Glatfelter has actually paid or becomes obligated to pay the amount of the averred deficiency.

Defendant correctly asserts that Glatfelter can *recover* under the indemnity agreement—that is, receive reimbursement from the Escrow Fund—only if it has suffered an actual loss. This sensible requisite for recovery is clear from the terms of § 9.01 as well as other provisions of the corporation documents. *See, e.g.*, Escrow Agree-

---

**14.** Stock Purchase Agreement at ¶ 9.01.

**15.** For the sake of convenience, hereafter the term "loss" will subsume and cover the terms

"liability," "damage," "cost" and "deficiency." *See*, Escrow Agreement at § 1.4.

ment at § 2.3.[16] Accordingly, tendering the avowedly overdue taxes to the various taxing authorities and filing a claim against the Escrow Fund does not prove that Glatfelter has suffered a loss for which it is entitled to indemnification. Indeed, rather than authorizing the release of escrow funds, Defendant Lewis responded to Glatfelter's claim by challenging the *bona fides* thereof, as defendant indisputably is permitted to do under the procedures set forth at § 3.2 of the Escrow Agreement.[17] Pursuant to § 3.2, the Escrow Agent may not release the claimed funds to Glatfelter unless specifically authorized to do so by the Shareholders' Representative or, in the alternative, upon a "final decision ... in an action between Glatfelter and the representative ..."[18]

Glatfelter filed the instant suit seeking a determination whether, as Glatfelter claims, Ecusta underpaid its 1986 income taxes. Upon decision by this court, and after the exhaustion of available appeals, if such are taken, the parties will have a "final determination," as defined by § 3.2 of the Escrow Agreement, resolving the question whether Glatfelter suffered a "loss" for which it is entitled to indemnifi-

cation. Thus, under the precise criteria and procedures set forth in the Stock Purchase and Escrow agreements, Glatfelter paid allegedly overdue back taxes, filed a claim against the Escrow Fund and defendant contested the claim culminating in this action to determine the *bona fides* of Glatfelter's allegation of loss.[19] Because the parties have fully followed the process prescribed in the relevant documents, defendant is not entitled to summary judgment on the theory that Glatfelter has failed to properly file a colorable claim against the escrow Fund.[20]

## IV.

### a.

In addition to his interpretation of the plain language of the corporation documents, defendant contends that under applicable tax law, plaintiff has suffered neither a loss nor a deficiency until and unless an appropriate taxing authority, such as the I.R.S., remits a notice of tax deficiency to plaintiff. Thus, according to defendant, Glatfelter has raised no colorable claim against the Escrow Fund. Plaintiff responds that taxes are due and owing from

---

16. § 2.3 of the Escrow Agreement states in part that, "If Glatfelter shall sustain any loss ... then Glatfelter will be entitled to receive from the Escrow Funds, in accordance with the provisions of Section 3 below, cash in the amount equal to the amount of any such Loss ..."

17. Specifically, pursuant to the Escrow Agreement at § 3.2, Glatfelter initiated its claim by filing a Claim Certificate with the Escrow Agent and the Ecusta Shareholders' Representative whereupon the Escrow Agent was required to pay the claim unless, as occurred herein, the Shareholders' Representative, Lewis, remitted to the Escrow Agent a timely written notice contesting the claim.

18. Section 3.2 clarifies that:

For this purpose, a "final decision" shall mean the final judgment of any court of competent jurisdiction from which no appeal has been allowed or with respect to which the time for appeal has expired, no appeal having been taken, or a final decision of an arbitrator under an arrangement providing for no appeal of such decision.

19. I pause to note that the foregoing contractual procedure has a familiar counterpart in modern

indemnity law. It is well established that parties may voluntarily settle claims and, thereafter, seek to recover indemnity when, "... the party paying was *himself legally liable* and could have been compelled to satisfy the claim." *Tugboat Indian Company v. A/S Ivarans Rederie*, 334 Pa. 15, 21, 5 A.2d 153, 156 (1939) (emphasis supplied); *see also, e.g., Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 317 (3d Cir.), *cert. den.*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Martinique Shoes, Inc. v. New York Progressive Wood Heel Co.*, 207 Pa.Super. 404, 217 A.2d 781, 783 (1966) (*en banc*).

20. It is worth accenting that defendant's explanation of the documents' plain language would not be limited solely to claims based on purported tax deficiencies. Indeed, under Defendant Lewis' interpretation, Glatfelter could initiate no claim against the Escrow Fund before and until some authoritative body had made a determination that the claim in fact is meritorious. Such a requisite, which contravenes the clear language of the documents, would fully negate the Escrow Agreement's earlier discussed logical procedural design mandating a judicial determination only when the Shareholders' Representative contests a given claim. Escrow Agreement at § 3.

the time Ecusta was obliged to file its 1986 tax returns and that plaintiff's subsequent filing of amended returns with accompanying funds to cover deficiencies and interest constitutes payment resulting from alleged "damage, liability, loss, cost [and/]or deficiency" under § 9.01 of the Stock Purchase Agreement. Plaintiff is correct.

This court need look no further than the plain language of the Internal Revenue Code itself which states:

> Except as otherwise provided in this subchapter, when a return of tax is required under this title or regulations, the person required to make such return shall, *without assessment or notice or demand from the Secretary,* pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return (determined without regard to any extension of time for filing the return.) ...

26 U.S.C. § 6151 (emphasis added). The foregoing section clearly states that taxes are due and are to be fully paid at the time and place wherein the tax return is properly and timely filed. Consistent with good sense, § 6151 clarifies that such tax is due and must be remitted on the initiative of the taxpayer without prompting from the Secretary of the I.R.S. through such media as a notice of tax deficiency.

The sensible and obvious statutory requirement that all taxes are due on the day they must be paid is fortified by a subsequent provision of the Internal Revenue Code which defines "deficiency." Specifically, a deficiency:

> ... means the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, or 44 exceeds the excess of—

(1) the sum of

> (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
> (B) the amounts previously assessed *(or collected without assessment)* as a deficiency over—

(2) the amount of rebates, as defined in subsection (b)(2), made.

26 U.S.C. § 6211 (emphasis added).[21]

As the underscored portion of § 6211 illustrates, the Internal Revenue Code recognizes that a tax deficiency exists independent of whether the I.R.S. actually issues a formal assessment of deficiency.[22]

Precedent confirms that the Code's plain language means what it says. Addressing in a somewhat different context the issue of tax deficiencies, the Supreme Court held forty years ago that:

> As of a certain date the taxpayer has a duty to file a return for the previous fiscal year *and pay the amount of tax actually due for that year.... From the date the original return [i]s to be filed until the date the deficiency was actually assessed, the taxpayer ha[s] a positive obligation to the United States: a duty to pay its tax.*

*Manning v. Seeley Tube & Box Co. of New Jersey,* 338 U.S. 561, 565, 70 S.Ct. 386, 388–89, 94 L.Ed. 346 (1950) (citations and footnote omitted, emphasis added).

Indeed, a half-century ago, interpreting one of the present Code's predecessors, the federal courts observed, "It would seem, therefore, that whenever the taxpayer has failed to make adequate return of income, there is a deficiency, notwithstanding lack

**21.** The Supreme Court had occasion to clarify that a tax deficiency as defined by § 6211 of the Code constitutes "... the amount of tax imposed less any amount that may have been reported by the taxpayer on his return." *Laing v. U.S.,* 423 U.S. 161, 173, 96 S.Ct. 473, 480, 46 L.Ed.2d 416 (1976) (footnote omitted).

**22.** Additional guidance comes from Internal Revenue Code provision 26 U.S.C. § 6601, establishing interest on deficient taxes, which states in relevant part:

> If any amount of tax imposed by this title ... is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

Interest under § 6601 begins to accrue on the date the taxes should have been paid, consequently, all taxes were due and payable on that date and taxes unpaid as of that date are deficient.

of determination by the Commissioner or his agents." *Moore v. Cleveland Railway Co.*, 108 F.2d 656, 659 (6th Cir.1940). Such has been the law throughout the various embodiments of the Code and it is the law under the present statute. *See, e.g., Pan American Van Lines v. U.S.*, 607 F.2d 1299, 1301 (9th Cir.1979); *F.D.I.C. v. U.S.*, 654 F.Supp. 794, 806 (N.D.Ga.1986); *U.S. v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla. 1977), *aff'd.*, 576 F.2d 650 (5th Cir.1978), *cert. den.*, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979).

In light of the foregoing statutory provisions and judicial explications, it comes as no surprise that the federal courts have held that, "Under section 6151 of the Internal Revenue Code, regardless of when Federal taxes are actually assessed, the taxes are considered as due and owing, and constitute a liability as of the date the tax return for the particular period is required to be filed." *F.D.I.C. v. U.S.*, 654 F.Supp. 794, 806 (N.D.Ga.1986) (citations omitted).[23] Plaintiff correctly asserts, therefore, that any deficiencies in the 1986 tax payments made by Ecusta, should such deficiencies exist, constitute a continuing liability against plaintiff as Ecusta's successor.[24]

b.

Defendant Lewis calls this court's attention to a line of state cases involving the

accrual of a cause of action sounding in accountant malpractice ensuing from the preparation of allegedly inaccurate tax returns and resulting alleged underpayment of taxes. These precedents do not control the case-at-bar.

First and foremost, the cases cited by defendant address a narrow question of state law, specifically, determining the moment a legal claim of accountant malpractice arises under the applicable state statute of limitations. Emphasizing that "damage" is a required element of the tort of malpractice, the cases uniformly hold that, "... no damages accrue[ ] to the plaintiff until the time of the Internal Revenue Service's assessment of penalties and interest." *Streib v. Veigel*, 109 Idaho 174, 706 P.2d 63, 67 (1985); *accord., Thomas v. Cleary*, 768 P.2d 1090, 1093–94 (Alaska 1989) (divided court); *Chisholm v. Scott*, 86 N.Mex. 707, 526 P.2d 1300, 1301–02 (1974); *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex.1967); *see also, Philips v. Giles*, 620 S.W.2d 750 (Tex.Ct.App.1981) (plaintiff voluntarily tendered taxes which she felt were deficient due to her *attorney's* alleged infirm tax advice).

Under these decisions, the limitations period for the tort of accountant or attorney malpractice regarding tax advice does not commence until the taxing authority as-

---

**23.** It is true, as defendant stresses, that "there is no clear statutory, regulatory or judicial authority for the proposition that the taxpayer is under a legal obligation to file an amended return upon discovery of a mistake or error on a prior year's return." 15 Mertens, *Law of Federal Income Taxation*, § 56.65, Supp. at 6. The presumed fact that the taxpayer is not mandated to amend his return in no manner obviates 26 U.S.C. §§ 6151, 6211 and 6601 and the unbroken precedent holding that in our "self-assessing" income tax system, taxes are owed and payable when the given tax return is due.

**24.** It is true, as Defendant Lewis states, that the corporation documents neither explicitly reference nor cite any particular tax code; nonetheless, "... substantive laws in effect when the parties enter into a contract are implicitly incorporated into it." *First National Bank of Pennsylvania v. Flanagan*, 515 Pa. 263, 528 A.2d 134, 137 (1987) (Citations omitted). Therefore, a tax deficiency must be precisely the type of "liability" against which Glatfelter is indemnified under § 9.01 of the Stock Purchase Agreement.

Moreover, the plain language of the corporation documents indicates the intention to encompass the Internal Revenue Code's definition of "deficiency." The documents address in detail Ecusta's tax status, expressly warranting the good tax standing of that corporation and indemnifying Glatfelter for any breaches of that warranty resulting in a "loss" or "deficiency". *See,* Stock Purchase Agreement at § 9.01; Corporation Agreement at § 3.12(a). In light of these detailed provisions, the use of the term "deficiency" in the corporation documents is particularly revealing. The concept of a "tax deficiency" presumably is well known among business attorneys, especially when, to help effectuate a complex acquisition, the sellers agree to indemnify the purchaser for "deficiencies" arising from, *inter alia,* the acquired corporation's failure to adequately pay its taxes. Clearly, § 9.01 of the Stock Purchase Agreement indemnifies Glatfelter for Ecusta's tax deficiencies and the definition of such deficiencies are found in the respective tax codes and interpretive judicial opinions.

sesses a deficiency. They do not hold that, as a matter of either federal or state law, tax deficiencies are neither due nor owing actually assessed by the appropriate taxing authority. Thus, the state rulings simply have no bearing in the instant action where, under the express terms of an indemnity contract, Glatfelter claims that it suffered a "loss" because Ecusta's taxes were deficient as defined by the Tax Code.

It addition, it bears emphasis that the state courts' legal rulings were prompted, at least in part, to minimize the possibility that plaintiffs' actions against accountants are deemed untimely. For instance, as the *Streib* court pointedly noted, "... we recognize that discovery of a negligently prepared income tax return is most difficult.... [Thus] we hold that the tortious negligence is continuing in nature until plaintiffs suffer damage." 706 P.2d at 67–68. Classifying accountant malpractice as a continuing tort rendered the *Streib* suit timely when measured from the date of the I.R.S. tax assessment. The action would have been time barred, however, had the limitations period run from the time the accountant prepared and filed the allegedly infirm tax returns.[25]

Herein, by contrast, the corporation documents themselves establish when a claim against the escrow Fund is ripe or stale. As accented above, had Glatfelter not brought its claim and paid the purportedly overdue taxes by November 7, 1988, it would have been effectively barred because the protection accorded by the Stock Purchase Agreement and the Escrow Agreement terminated on that date. Certainly, state court decisions designed to maximize the ability of a plaintiff to commence a tort action provides scant support for defendant's argument that plaintiff's claim against the Escrow Fund was unripe.

## V.

In light of the foregoing discussion, I find that Glatfelter may press its claim against the Escrow Fund. Therefore, I will DENY Defendant's Motion For Summary Judgment.

---

25. Indeed, the *Streib* court noted that had it not viewed malpractice as a continuing tort, plaintiff's suit would have been untimely pursuant to Idaho Stat. § 5–219(4) which abrogated the discovery rule in tort. *Id.* The dissenting justices severely criticized the majority on this point, arguing that the *Streib* holding was nothing more than a transparent device to avoid the strictures of § 5–219(4) and, thereby, frustrate the legislature's intent to do away with the discovery rule. *Id.*, 706 P.2d at 69–70 (Bakes, J., dissenting).